Filed 11/3/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>LUIS WILLIAM PALAFOX,<br><br>    Defendant and Appellant. | F067413<br><br>(Super. Ct. No. BF125737B)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John S. Somers, Judge.

Heather J. MacKay, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, and Kathleen A. McKenna, Deputy Attorney General, for Plaintiff and Respondent.

-ooOoo-

Luis William Palafox (defendant) appeals from the imposition of consecutive terms of life in prison without the possibility of parole (LWOP) for two special-circumstance murders he and Kyle Hoffman committed when both were 16 years old.  In this case of first impression, we conclude the sentence is constitutional despite the trial court's inability to exclude the possibility of rehabilitation.  No particular factor, relevant to the decision whether to impose LWOP on a juvenile who has committed murder, predominates under the law.  Hence, as long as a trial court gives due consideration to an offender's youth and attendant characteristics, as required by *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455] (*Miller*), it may, in exercising its discretion under Penal Code section 190.5, subdivision (b), give such weight to the relevant factors as it reasonably determines is appropriate under all the circumstances of the case.  Accordingly, we affirm.

## FACTS AND PROCEDURAL HISTORY[1]

Sometime between August 4 and 6, 2008, an elderly couple, Joseph and Dorothy Parrott, were murdered in their beds at their Bakersfield home.  Joseph Parrott was stabbed multiple times in the neck and beaten about the head and upper body with a linear object.  His death, which was caused by sharp and blunt-force injuries, was not instantaneous.  Dorothy Parrott was severely beaten all over her body with a linear object, and the entire right side of her face was crushed.  The cause of her death was blunt force head trauma.  In each instance, the bruising was consistent with a baseball bat.  Several months later, items taken from the Parrott home were found in defendant's and Hoffman's residences.  Blood on defendant's knife matched Joseph Parrott's genetic profile.

---

**1** The facts are taken from our opinion in defendant's prior appeal.  (*People v. Hoffman et al.* (July 5, 2012) F061127 [nonpub. opn.].)  By separate order, we have taken judicial notice of the appellate record and opinion in that case.

Defendant's and Hoffman's cases were consolidated for trial, but separate juries were impaneled. Hoffman's jury heard evidence Hoffman confessed that the two broke into the house to get money for drugs. They chose that house because they did not see any car and no one answered a knock on the front door. Defendant, who was carrying a wooden baseball bat, said that, if there were any people, he would take care of them, although Hoffman professed to believe defendant was kidding. According to Hoffman, he remained outside while defendant went in. By the time Hoffman entered, the Parrotts were dead. Hoffman and defendant then took various items from the residence. Hoffman insisted he did not kill anyone or see defendant hurt either victim. Defendant did, however, tell him what defendant did and how it felt.

Defendant's jury heard evidence Hoffman's sister overheard defendant and Hoffman talking about going into someone's house and stealing. They took her baseball bat with them when they left the Hoffman apartment. She subsequently saw money and jewelry in Hoffman's backpack. When she asked defendant about his involvement in the murders, defendant denied, more than once, knowing what she was talking about. Eventually, however, he admitted he was involved and told her not to talk about it.

Defendant and Hoffman each were convicted of two counts of first degree murder (Pen. Code,[2] § 187, subd. (a)), with multiple-murder (§ 190.2, subd. (a)(3)), robbery-murder (*id*., subd. (a)(17)(A)), and burglary-murder (*id*., subd. (a)(17)(G)) special circumstances. Each was sentenced to two consecutive LWOP terms.[3]

We originally affirmed the judgments in their entirety, rejecting claims, inter alia, that imposition of LWOP on a juvenile — even one who killed — violates the federal and

---

[2]     Further statutory references are to the Penal Code.

[3]     Prior to sentencing, defendant and Hoffman each unsuccessfully challenged the constitutionality of an LWOP sentence when imposed on a juvenile, and asked the trial court to exercise its discretion under section 190.5, subdivision (b) to impose a sentence of 25 years to life.

3.

state Constitutions.  Upon petition for rehearing, however, we modified our opinion to include a lengthy discussion of *Miller*.  We found the trial court did not abuse its discretion under the law as it stood when it sentenced defendant and Hoffman.  Nevertheless, we concluded that because the "characteristics discussed in *Miller* were not at the forefront of the factors considered by the trial court when exercising its discretion …, [defendant and Hoffman were] entitled to have the trial court reconsider its decision under section 190.5, subdivision (b) in light of *Miller*, and to be resentenced accordingly." (*People v. Hoffman*, *supra*, F061127, as mod. July 30, 2012, fn. omitted.)  As a result, we affirmed the judgments of conviction, but vacated the sentences and remanded the matters to the trial court "to exercise its discretion under … section 190.5 in light of *Miller*" and to resentence defendant and Hoffman.  (*Ibid*.)

In preparation for the resentencing hearing, defendant presented a written report prepared by Angela Mason, a licensed clinical social worker who specialized in forensic social work and mitigation.[4]  In her report, Mason related she had twice interviewed defendant, who was born in March 1992, and who had the demeanor of an adolescent.  She also interviewed three of his aunts, and his parents.  She reviewed the petition for rehearing filed in this court; our order modifying the opinion and denying rehearing; a

---

[4]     Hoffman apparently submitted a statement in mitigation and requested that the court resentence him to life in prison with the possibility of parole.  He also presented live testimony at the resentencing hearing.  Because Hoffman is not before us on this appeal, we do not summarize the evidence or argument pertinent only to him.

Defendant presented no witnesses at the hearing, but the trial court stated it had read and considered Mason's report (as to which the prosecutor expressly waived any evidentiary objections).  In addition, the court took judicial notice, at defense counsel's request, of the evidence adduced at trial; the evidence presented in support of the motions (including statements made by defendant and Hoffman), and the rulings, that resulted in two juries hearing the case; and defendant's submissions and arguments at the original sentencing hearing.

November 20, 2009, psychological evaluation by Eugene Couture, Ph.D.[5]; the probation officer's report; and school records from the Moreno Valley Unified School District.

Mason's report related that defendant's maternal grandfather died in prison after being convicted of molesting a 12-year-old relative. Two of defendant's uncles (one of whom was Hoffman) were serving life sentences for murder. Defendant's maternal grandmother beat his mother, who, along with one of her sisters and a brother, got involved in gangs. Defendant's father was also a gang member. Defendant's maternal grandmother used cocaine and "speed," and his paternal grandfather was an alcoholic.

Defendant's mother became pregnant with him at age 15. Defendant's father described it as an unwanted and unplanned pregnancy.[6] Although defendant's mother denied using drugs during her pregnancy, she smoked marijuana daily and drank — sometimes heavily — on weekends after defendant was born.[7] Gunfire and gang activity were frequent in the neighborhood in which defendant lived.

Defendant's parents separated in 1993. Prior to their separation, defendant was frequently exposed to incidents of domestic violence.[8] After the separation, defendant's

---

**5** This was a pretrial competency evaluation.

**6** According to sources cited by Mason, children born from unplanned or unwanted pregnancies are at risk for significantly lower cognitive test scores than children born as the result of intended pregnancies. Such children also have poorer physical and mental health, and some have higher levels of delinquency.

**7** According to Mason, parental alcohol and drug abuse adversely impact children's development through inherited substance vulnerability, modeled substance abuse, and exposure to other drug dependent persons. Such children are also at greater risk for psychological injury as a result of parental emotional detachment, neglect, physical and/or emotional abuse, and demands for premature responsibility.

**8** According to sources cited by Mason, exposure to violence in the home can harm the development of the brains of infants and small children, and impair cognitive and sensory growth.

father rarely chose to see him. Defendant's mother moved a lot and continued to drink and smoke marijuana.

Defendant's mother became involved with another gang member, Israel Rios, and together they had four children. Rios and defendant's mother used drugs, smoked marijuana with the children in the house, and Rios drank heavily. Rios was aggressive with the children, and whipped defendant with his hand or a belt until defendant turned 12 years old and was "too big to beat." Because the family moved around a lot, defendant never joined a gang.

Mason related that defendant's family "suffered from multigenerational abject poverty." Research has shown "poverty damages children's dispositions, blunts their brains, and causes permanent brain damage from excessive exposure to toxic stress." Mason surmised a "'blunted brain'" may have made defendant appear cold and distant to doctors and probation officers, when in reality he may have been showing the signs of poverty and its effects.

Mason's report detailed the large number of different schools defendant attended throughout his life. In high school, he tested below basic in English and algebra, and far below basic in world history, life science, and biology. According to an aunt, he had speech problems and a lisp. Another aunt described him, as an adolescent, as "quiet, withdrawn, and young-minded." During his school years, he was suspended multiple times for marijuana, possession of a knife, tagging, and other behavior problems. When, during high school, defendant got in trouble for marijuana, his mother enrolled him in individual and group counseling for a few months. According to Mason, however, it was unlikely counseling would have been effective without addressing the root problems of the family's issues with drugs, alcohol, gangs, domestic violence, and delinquent activities.

Mason related that, according to an aunt, defendant had "self-injurious behavior," including biting and burning. On one occasion, he set the bathroom on fire. He used

6.

drugs and drank, drinking heavily at least three times a year. He started using marijuana at age 13, and smoked it daily until his arrest in this case.[9] He experimented with cocaine and ecstasy. Three months before his arrest, his mother caught him inhaling Freon.

Despite everything, defendant was kind and helpful to his family. He babysat and cared for his younger siblings, and got them ready for school while his mother slept. After Rios hurt his back in an accident, defendant took care of the house and yard. He also helped people in need, such as by loading grocery bags into cars for people at the store and helping his blind grandfather do laundry. His aunt tried to get defendant to live with her, as she wanted to be a positive influence in his life, but he felt he had to stay with his mother, because she needed him to care for his younger siblings.

At the end of July 2008, defendant's mother lost the family's rent money. Rios got drunk, and they had a physical altercation in the front yard of their Moreno Valley home. Defendant told Rios to leave his mother alone, and he and Rios exchanged words. Rios threw a beer bottle at defendant's mother, and it hit her in the back of the head. She was bleeding and sustained a concussion, but did not seek medical help. No one called the police.[10] Defendant, his mother, and his maternal grandmother and an aunt went to the maternal grandmother's home in Bakersfield.[11] A couple of weeks later, Rios and

---

**9** Counsel for Hoffman referred to a study that found people who began using marijuana before age 16, and used it frequently, performed poorly on tests of cognitive flexibility, the ability to change one's response to something based on the context of the situation. He also mentioned an article titled "Teen Brain More Prone to Drug/Alcohol Damage," which appears to have discussed how marijuana affects the teenage brain more significantly than the adult brain.

**10** According to sources cited by Mason, children exposed to domestic violence are at greater risk for substance abuse, juvenile pregnancy, and criminal behavior than those raised in homes without violence. Some studies suggest social development is also damaged, with some children losing the ability to feel empathy for others and many exhibiting signs of aggressive behavior.

**11** Defendant's maternal grandmother was Hoffman's mother.

defendant's mother reconciled. This saddened and disappointed defendant, who remained in Bakersfield with his grandmother. Defendant's mother blamed herself for the present offenses, because she left defendant in Bakersfield "in an emotionally fragmented state." He had never been violent before; it was not in his character.

Mason related that defendant felt sorry for the Parrotts' deaths, and wished things were different. He knew he did wrong and felt he belonged in prison. He wanted to be a better person.

Mason detailed the various risk factors with which defendant grew up, and noted he had "nearly every imaginable risk factor for violence and delinquency," while lacking protective buffering factors other than the positive influence of one of his aunts. She also listed the various factors that shaped defendant's life and influenced his involvement in the instant offense. She ended her report by observing that defendant's mother left defendant with his grandmother in Bakersfield. Because of her long history of drug addiction and poor parenting skills, the grandmother could not supervise or comfort defendant, who was emotionally distraught over his mother and Rios's violence and separation. Mason surmised Hoffman "likely took advantage of his younger nephew by encouraging his involvement in the instant offense."[12]

Defense counsel acknowledged defendant was a full participant in the Parrott murders, which counsel termed "horrible" and "inexcusable," and that defendant and Hoffman were mature, intelligent, and articulate. Counsel argued defendant was 16 when these crimes were committed, people change and grow over time, and defendant was going to be severely punished even without an LWOP sentence. He urged the court not to "give up on [defendant] totally." The prosecutor asserted the murders were "about as bad as it gets," and pointed out the Parrotts "[did not] have to die." He argued *Miller* did

---

[12] The probation officer's reports submitted in connection with the original sentencing show Hoffman was not quite seven months older than defendant.

not say LWOP constituted cruel and unusual punishment for juveniles, but merely said such a sentence could not be mandatory, and so "sort of changed the game a little bit, but not really in California." He urged the court to sentence defendant to LWOP.

In determining whether to reimpose LWOP sentences on defendant, the trial court considered the factors *Miller* found appropriate, though not exclusive, for making such a determination: (1) chronological age and its hallmark features, including immaturity, impetuosity, and failure to appreciate risks and consequences; (2) family and home environment, from which the juvenile usually cannot extricate him- or herself, no matter how brutal or dysfunctional; (3) the circumstances of the homicide offense, including the extent of the defendant's participation and the way familial and peer pressures may have affected him or her; (4) that the defendant might have been charged and convicted of a lesser offense if not for incompetencies associated with youth; and (5) the possibility of rehabilitation. The court also considered a sixth factor, the presence or absence of any criminal history.

The court found chronological age and its hallmark features not as significant a factor as it might be in some cases. The court noted defendant and Hoffman both were older and somewhat more mature, at the time of events, than some juveniles, such as the 14-year-old defendants in *Miller*. The court further found neither their conduct in the commission of the offenses nor anything about them exhibited an exceptional or unusual level of immaturity below that ordinarily experienced with juveniles. The court found a poor appreciation of risk and consequences, or at least an unwillingness to be concerned; however, the fact defendant entered the victims' house armed with a weapon showed an appreciation of the potential for violent confrontation and ensuing loss of life, yet defendant decided to proceed. The court did not find this to be an aggravating factor indicating LWOP necessarily should be imposed; virtually all juvenile offenders exhibit some level of immaturity, impetuosity, and poor appreciation of risks and consequences.

The court next found defendant's family and home environment had some impact on defendant, who had "a very disruptive and relatively chaotic background." The court found the factor pointed, to some extent, in favor of imposition of a non-LWOP sentence, because defendant's history affected his ability to learn and adjust to situations in which decisions had to be made. The court observed, however, that many people came from similar backgrounds without making the choices and decisions defendant made.

With respect to the third factor, the court found the circumstances of the offense to be "one of the worst homicide situations" it had seen in nearly 30 years. The court found it "shock[ing]" that people could not understand the potentially extreme danger of a residential burglary, particularly one committed in the nighttime when occupants were home. The court noted people feel safe in their homes, particularly when asleep at night, and are in a relatively defenseless position. People are entitled to defend themselves with deadly force, if necessary, when encountering an intruder, a situation the court found defendant appreciated, since at least one and possibly two weapons were brought to the scene. The court characterized the assaults that led to the injuries inflicted as "savage," with both victims completely vulnerable and taken by total surprise "at the time they were attacked with the obvious and sole intent of killing them." The court concluded those circumstances pointed to an LWOP sentence.

The court did not find the fourth factor to be significant, as this was not a situation in which defendant suffered a conviction more serious than he otherwise might have suffered had he been older and more able to appreciate and understand the criminal justice system.

The court found the possibility of rehabilitation to be a difficult factor, because it was being asked to predict what defendant would be like after at least a quarter and perhaps half a century in a "harsh and unforgiving" setting. The court stated:

10.

"I lack confidence most of the time in my ability to predict what will happen next week let alone in my ability to predict what another individual will be like after such a period of time.

"… I certainly will not exclude the possibility in this case, perhaps a significant one, that both [defendant] and Mr. Hoffman have some significant possibility of rehabilitating, if you will, and becoming useful citizens, but it's difficult to say what they will be like or what they could contribute or be in a position to contribute or may be willing to make the effort to contribute after the extremely lengthy time … both of them will be incarcerated ….

"That is a factor I think, and I can't characterize it as an insignificant factor it would seem since it does exist to point in the direction of the less serious of the potential sentences, … but by the same token I will note as again as I mentioned in the first factor, both are older than many juveniles who were involved in such cases, did not strike me as being unusually immature or uneducated or anything of that nature. So under the circumstances I cannot say that is the dispositive factor by itself, though it certainly is one to be considered."

Last, the court noted defendant had no previous criminal history. Although there was some admitted narcotics involvement, the court did not find it to be of great weight, and in any event, it pointed against an LWOP sentence. Based on its experience, however, the court observed that juveniles often have relatively minimal records because they have not had time to accumulate a considerable criminal history. It also found it "not at all uncommon" to have such serious offenses committed by someone with no or an insignificant prior criminal record. As a result, it found this factor not dispositive.

The court concluded:

"Weighing all of those factors and considering them and exercising my discretion, I find some factors that are essentially neutral, just a couple that tend to weigh in favor of a life without the possibility of parole sentence or at least don't point against it, and a couple of factors that I think do weigh in favor of a less than life without the possibility of parole sentence, but it isn't a counting exercise. It is a weighing exercise as it would be in a penalty phase in a death penalty case were the jury trying the matter.

11.

"I come back to the fact in the end when I weigh these factors, the one that is by far the greatest weight to me is the circumstances of the offences [*sic*] that were committed in this particular case and not just the severity and brutality of the crimes involved, but the fact that there is absolutely no question that the potential consequences to the Parrotts, who were doing nothing other than sleeping in their own home, were unaware prior to the assaults at the beginning, as far as anyone can tell presence, certainly outside their home as the discussion is taking place that [defendant] and Mr. Hoffman were calculating and considering violating their rights and perhaps even inflicting harm on them, and the fact that there was discussion of the fact and the presence of the weapon, at least one weapon, ultimately more, to for lack of a better term execute the Parrotts if in fact their presence became or was perceived to be a problem in terms of Mr. Hoffman and [defendant] carrying out their objectives of taking what property they wished to be found inside.

"I find almost more chilling than … what happened … when the offences [*sic*] were committed the fact two individuals in question stood outside at some point and had a discussion about what to do to the people inside if they were located. That to me is almost a very definition of premeditated murder."

The court then resentenced defendant (and Hoffman) to two consecutive terms of LWOP, which, in the exercise of its discretion, it found to be the appropriate sentence. It also ordered payment of various fees, fines, and restitution.

## DISCUSSION

Defendant contends imposition of LWOP terms in this case constitutes cruel and/or unusual punishment under the federal and state Constitutions. He says the Eighth Amendment to the United States Constitution, as construed in *Miller*, forbids imposition of an LWOP sentence on a juvenile offender except when the facts show said juvenile is irreparably corrupt. He asserts the facts did not show irreparable corruption and the trial court's statement regarding rehabilitation constituted a finding of "significant possibility that [defendant] could someday demonstrate rehabilitation." He argues we must, therefore, again vacate the sentence and remand the matter to the trial court with instructions to impose a term that includes "a meaningful possibility of parole."

12.

Whether defendant is correct depends on whether the *Miller* factors, applied to an exercise of discretion under section 190.5, subdivision (b), can be given whatever weight the trial court reasonably finds to be appropriate in light of the particular circumstances of the case, or whether one factor — the possibility of rehabilitation — predominates. If the former, the sentence stands as constitutional. If the latter, defendant is entitled to a sentence that affords him a realistic opportunity to obtain release.[13]

The Eighth Amendment to the United States Constitution applies to the states. (*People v. Caballero* (2012) 55 Cal.4th 262, 265, fn. 1.) It prohibits the infliction of "cruel *and* unusual" punishment. (U.S. Const., 8th Amend., italics added.) Article I, section 17 of the California Constitution prohibits infliction of "[c]ruel *or* unusual" punishment. (Italics added.) The distinction in wording is "purposeful and substantive rather than merely semantic. [Citations.]" (*People v. Carmony* (2005) 127 Cal.App.4th

---

[13] The Attorney General argues the sentence is constitutional under *Miller* because it was not mandatory, the trial court engaged in an individualized consideration of the pertinent sentencing factors, and defendant may seek recall of his sentence, after 15 to 24 years, under section 1170, subdivision (d)(2).

In *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*), the California Supreme Court rejected the assertion section 1170, subdivision (d)(2) "removes life without parole sentences for juvenile offenders from the ambit of *Miller*'s concerns because the statute provides a meaningful opportunity for such offenders to obtain release." (*Gutierrez*, at p. 1386.) Rather, the court observed, "… *Miller* repeatedly made clear that the sentencing authority must … consider[] how children are different and how those differences counsel against a sentence of life without parole '*before* imposing a particular penalty.' [Citations.]" (*Id.* at p. 1387.)

Although the overriding question in *Gutierrez* was whether section 190.5, subdivision (b) contains a presumption in favor of LWOP, its analysis of section 1170, subdivision (d)(2) applies equally to the Attorney General's argument here (which, we recognize, was made before *Gutierrez* was decided). Accordingly, we reject, without further discussion, the Attorney General's claim the possibility of a sentence recall in the future enters into a determination of constitutionality under *Miller*. (We do not address the youthful offender parole hearing process contained in § 3051, since it does not apply to individuals sentenced to LWOP. (*Id.*, subd. (h).))

1066, 1085.)  As a result, we construe the state constitutional provision "separately from its counterpart in the federal Constitution.  [Citation.]"  (*People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1136.)  This does not make a difference from an analytic perspective, however (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358, fn. 7), and defendant does not contend the provisions should be separately analyzed in his case (see *People v. Blackwell* (2011) 202 Cal.App.4th 144, 158, disapproved on another ground in *Gutierrez*, *supra*, 58 Cal.4th at pp. 1370-1371, 1387).  The touchstone in each is gross disproportionality.  (See *Ewing v. California* (2003) 538 U.S. 11, 21 (lead opn. of O'Connor, J.); *Rummel v. Estelle* (1980) 445 U.S. 263, 271; *People v. Dillon* (1983) 34 Cal.3d 441, 479.)  Whether a punishment is cruel and/or unusual is a question of law subject to our independent review, but underlying disputed facts must be viewed in the light most favorable to the judgment.  (*People v. Abundio* (2013) 221 Cal.App.4th 1211, 1217; *People v. Felix* (2003) 108 Cal.App.4th 994, 1000.)

As the analytic framework for a claim punishment is excessive requires reference to "'the evolving standards of decency that mark the progress of a maturing society'" (*Atkins v. Virginia* (2002) 536 U.S. 304, 311-312), the United States Supreme Court's views with respect to the sentencing of juvenile offenders have been evolving for some time.  One theme has remained constant for decades:  the recognition that "children are constitutionally different from adults for purposes of sentencing."  (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2464].)  Because *Miller*, the case with which we are most concerned, arises from what came before it, we examine several of its underpinnings.

In *Eddings v. Oklahoma* (1982) 455 U.S. 104, the high court reversed a sentence of death imposed on a juvenile who was 16 at the time he murdered a police officer, and remanded with directions to consider all relevant mitigating evidence.  (*Id.* at pp. 105-106, 117.)  The sentencer took the defendant's youth into account as a mitigating factor, but not evidence of his troubled upbringing and emotional disturbance.  (*Id.* at pp. 108-109.)  In holding that a sentencer cannot refuse to consider, or be precluded from

14.

considering, any relevant mitigating evidence (*id*. at pp. 113-115), the high court observed: "The trial judge recognized that youth must be considered a relevant mitigating factor. But youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage.… [¶] Even the normal 16-year-old customarily lacks the maturity of an adult." (*Id*. at pp. 115-116, fn. omitted.)

In *Thompson v. Oklahoma* (1988) 487 U.S. 815, the court held the Eighth Amendment bars the execution of any offender under the age of 16 at the time of the crime. (*Thompson v. Oklahoma*, *supra*, at pp. 822-823, 838.) The court noted: "The reasons why juveniles are not trusted with the privileges and responsibilities of an adult also explain why their irresponsible conduct is not as morally reprehensible as that of an adult." (*Id*. at p. 835, fn. omitted.)

In *Roper v. Simmons* (2005) 543 U.S. 551 (*Roper*), the court held the Eighth Amendment forbids imposition of the death penalty on juvenile offenders under 18 years of age. (*Roper*, *supra*, at p. 568.) It observed that the Eighth Amendment requires that capital punishment "be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.' [Citation.]" (*Ibid*.) Yet, "[t]hree general differences between juveniles under 18 and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders. First, as any parent knows and as the scientific and sociological studies … tend to confirm, '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults …. These qualities often result in impetuous and ill-considered actions and decisions.' [Citations.]" (*Id*. at p. 569.) Second, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. [Citation.]" (*Ibid*.) Third, "the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed. [Citation.]" (*Id*. at p. 570.) Thus,

"[t]he susceptibility of juveniles to immature and irresponsible behavior means 'their irresponsible conduct is not as morally reprehensible as that of an adult.' [Citation.] Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. [Citation.] The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, '[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.' [Citations.]" (*Ibid.*)

Because of juveniles' "diminished culpability," the court found, the penological justifications for the death penalty — retribution and deterrence — apply to them with less force than to adults. (*Roper*, *supra*, 543 U.S. at p. 571.) The court acknowledged "the brutal crimes too many juvenile offenders have committed," and conceded an argument could be made that "a rare case might arise in which a juvenile offender has sufficient psychological maturity, and at the same time demonstrates sufficient depravity, to merit a sentence of death." (*Id.* at p. 572.) Nevertheless, it found it necessary to adopt a categorical rule barring imposition of the death penalty on anyone under the age of 18, rather than permitting consideration of mitigating arguments related to youth on a case-by-case basis: "The differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability. An unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime would overpower mitigating arguments based on youth as a matter of course, even where the juvenile offender's objective immaturity, vulnerability, and lack of true depravity should require a sentence less severe than death." (*Id.* at pp. 572-573.) The high court concluded: "It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects

16.

unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.… When a juvenile offender commits a heinous crime, the State can exact forfeiture of some of the most basic liberties, but the State cannot extinguish his life and his potential to attain a mature understanding of his own humanity." (*Id.* at pp. 573-574.)

Five years later, in *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), the high court relied heavily on *Roper* to hold: "The Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide. A State need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term." (*Id.* at p. 82.) The court stated: "Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character' than are the actions of adults. [Citation.]" (*Id.* at p. 68.) Turning to the nature of the offenses to which LWOP might apply, the court "recognized that defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers," and so "[i]t follows that, when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability." (*Id.* at p. 69.)

The court observed that LWOP "is 'the second most severe penalty permitted by law'" (*Graham*, *supra*, 560 U.S. at p. 69), and "an especially harsh punishment for a juvenile. Under this sentence a juvenile offender will on average serve more years and a greater percentage of his life in prison than an adult offender." (*Id.* at p. 70.) The court determined that retribution — a legitimate reason to punish — could not support such a sentence: "*Roper* found that '[r]etribution is not proportional if the law's most severe penalty is imposed' on the juvenile murderer. [Citation.] The considerations underlying that holding support as well the conclusion that retribution does not justify imposing the second most severe penalty on the less culpable juvenile nonhomicide offender." (*Id.* at

pp. 71-72.) Deterrence likewise did not justify the sentence; because juveniles lack maturity and a fully developed sense of responsibility, they are "less likely to take a possible punishment into consideration when making decisions." (*Id*. at p. 72.)

The court further found that incapacitation — also a legitimate reason for imprisonment given the serious risk recidivism poses to public safety — could not justify an LWOP sentence for juveniles who did not commit homicide. (*Graham*, *supra*, 560 U.S. at p. 72.) The court reasoned: "To justify life without parole on the assumption that the juvenile offender forever will be a danger to society requires the sentencer to make a judgment that the juvenile is incorrigible. The characteristics of juveniles make that judgment questionable." (*Id*. at pp. 72-73.) "A life without parole sentence improperly denies the juvenile offender a chance to demonstrate growth and maturity." (*Id*. at p. 73.)

Finally, the court considered the penological goal of rehabilitation, and concluded an LWOP sentence could not be justified by that goal. (*Graham*, *supra*, 560 U.S. at pp. 73-74.) It explained: "The penalty [of LWOP] forswears altogether the rehabilitative ideal. By denying the defendant the right to reenter the community, the State makes an irrevocable judgment about that person's value and place in society. This judgment is not appropriate in light of a juvenile nonhomicide offender's capacity for change and limited moral culpability." (*Id*. at p. 74.)

The court concluded: "In sum, penological theory is not adequate to justify life without parole for juvenile nonhomicide offenders. This determination; the limited culpability of juvenile nonhomicide offenders; and the severity of life without parole sentences all lead to the conclusion that the sentencing practice under consideration is cruel and unusual. This Court now holds that for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole. This clear line is necessary to prevent the possibility that life without parole sentences will be imposed on juvenile nonhomicide offenders who are not sufficiently culpable to merit that punishment." (*Graham*, *supra*, 560 U.S. at p. 74.)

18.

*Miller* was decided two years after *Graham*, and drew extensively from that and from the *Roper* opinion. In *Miller* and its companion case, two 14-year-old offenders were convicted of murder and sentenced to LWOP, the term mandated by state law. (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2460].) Because "[s]uch a scheme prevents those meting out punishment from considering a juvenile's 'lessened culpability' and greater 'capacity for change,' [citation]" and runs afoul of the requirement in the high court's cases of "individualized sentencing for defendants facing the most serious penalties," the court held "*mandatory* life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" (*Ibid*., italics added.)

*Miller* reiterated many of the findings of *Graham* and *Roper* with respect to children's "distinctive (and transitory) mental traits and environmental vulnerabilities," as well as *Graham*'s insistence that "youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole." (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2465].) The court stated: "By removing youth from the balance — by subjecting a juvenile to the same life-without-parole sentence applicable to an adult — [mandatory penalty schemes] prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender. That contravenes *Graham*'s (and also *Roper*'s) foundational principle: that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." (*Id*. at p. ___ [132 S.Ct. at p. 2466].)

The high court required "that a sentencer have the ability to consider the 'mitigating qualities of youth,'" which, it observed, "'is more than a chronological fact.' [Citation.] It is a time of immaturity, irresponsibility, 'impetuousness[,] and recklessness.' [Citation.] It is a moment and 'condition of life when a person may be most susceptible to influence and to psychological damage.' [Citation.] And its

19.

'signature qualities' are all 'transient.' [Citation.]" (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2467].)  The court explained:

> "So *Graham* and *Roper* and our individualized sentencing cases alike teach that in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult.  To recap:  Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features — among them, immaturity, impetuosity, and failure to appreciate risks and consequences.  It prevents taking into account the family and home environment that surrounds him — and from which he cannot usually extricate himself — no matter how brutal or dysfunctional.  It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him.  Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth — for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys.  [Citations.]  And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Id.* at p. ___ [132 S.Ct. at p. 2468].)

The court turned to the two cases before it.  It observed that the juvenile in one case was neither the killer, nor did the prosecution argue he intended to kill.  Rather, he was convicted as an aider and abettor.  Although he knew his companion had a gun, the court found his age may have affected his calculation of the risk it posed, as well as his willingness to disengage from his companions before anything happened.  In addition, his family background was one of violence, with both his mother and grandmother having previously shot other individuals. (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2468].)  Although the juvenile in the other case committed a "vicious" murder, he and his companion did so when high on drugs and alcohol consumed with the adult victim.  Moreover, the juvenile's background was one of neglect and physical abuse, as well as four suicide attempts, the earliest when he was kindergarten age.  The high court found it "beyond question" that the juvenile deserved "severe punishment" for killing the victim, but, in each of the cases, also found the sentencer needed to examine all the

circumstances before concluding LWOP was the appropriate penalty. (*Id*. at p. ___ [132 S.Ct. at p. 2469].)**14**

The high court stated:

> "We therefore hold that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. [Citation.] By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment. Because that holding is sufficient to decide these cases, we do not consider [the juveniles'] alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger. But given all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.] Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller*, *supra*, 567 U.S. at p. ___, fn. omitted [132 S.Ct. at p. 2469, fn. omitted].)

The court reiterated: "Our decision does not categorically bar a penalty for a class of offenders or type of crime — as, for example, we did in *Roper* or *Graham*. Instead, *it mandates only that a sentencer follow a certain process — considering an offender's youth and attendant characteristics — before imposing a particular penalty*. And in so

---

**14** The majority took the dissent to task for repeatedly referring to 17-year-olds who had committed "the 'most heinous' offenses," such as deliberately murdering an innocent victim or setting off a bomb in a crowded shopping mall, and the 14-year-olds at issue in the cases before the court. The majority noted: "Our holding requires factfinders to attend to exactly such circumstances — to take into account the differences among defendants and crimes." (*Miller*, *supra*, 567 U.S. at p. ___, fn. 8 [132 S.Ct. at p. 2469, fn. 8].)

21.

requiring, our decision flows straightforwardly from our precedents: specifically, the principle of *Roper*, *Graham*, and our individualized sentencing cases that youth matters for purposes of meting out the law's most serious punishments." (*Miller*, *supra*, 567 U.S. at p. ___, italics added [132 S.Ct. at p. 2471, italics added].)

California's statutory scheme has long afforded trial courts sentencing discretion where defendants who were tried as adults but were 16 or 17 years old when they committed murder are concerned. Thus, subdivision (b) of section 190.5 provides: "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances … has been found to be true …, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life."

Properly construed so as not to impose a presumption in favor of LWOP, "the sentencing regime created by section 190.5[, subdivision ](b) authorizes and indeed requires consideration of the distinctive attributes of youth highlighted in *Miller* .…" (*Gutierrez*, *supra*, 58 Cal.4th at p. 1361.) Accordingly, the statute "confers discretion on a trial court to sentence a 16- or 17-year-old juvenile convicted of special circumstance murder to life without parole or to 25 years to life .…" (*Id*. at p. 1360.) In exercising that discretion, "the trial court must consider all relevant evidence bearing on the 'distinctive attributes of youth' discussed in *Miller* and how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders.' [Citation.] To be sure, not every factor will necessarily be relevant in every case. For example, if there is no indication in the presentence report, in the parties' submissions, or in other court filings that a juvenile offender has had a troubled childhood, then that factor cannot have mitigating relevance. But *Miller* 'require[s] [the sentencer] to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' [Citation.]" (*Id.* at p. 1390.)

Although section 190.5, subdivision (b) does not expressly so provide, in making a decision under that statute, "a sentencing court must consider the aggravating and mitigating factors enumerated in Penal Code section 190.3 and the California Rules of Court. [Citation.]" (*Gutierrez*, *supra*, 58 Cal.4th at p. 1387; accord, *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1089, 1092, disapproved on another ground in *Gutierrez*, *supra*, at pp. 1370-1371, 1387.) The trial court here considered the applicable factors — particularly those set out in *Miller*— with no presumption in favor of LWOP.[15] It then weighed the various factors and determined LWOP was the appropriate sentence.

Defendant says the resulting sentence is unconstitutional. He argues that because terms of life in prison *with* the possibility of parole allow the state to incarcerate a prisoner until he or she has demonstrated full rehabilitation, "it is never appropriate for a California court to impose an LWOP term on any juvenile." The California Supreme Court implicitly rejected this assertion in *Gutierrez*, when it remanded for resentencing because the two trial courts involved imposed LWOP sentences "without proper guidance on the sentencing discretion conferred by section 190.5[, subdivision ](b) and the considerations that must inform the exercise of that discretion .…" (*Gutierrez*, *supra*, 58 Cal.4th at pp. 1391-1392.) The high court left open the possibility an LWOP term could constitutionally be imposed on each defendant.[16] Thus, while we agree a life-with-parole term may, in reality, become an LWOP sentence if the defendant does not demonstrate

---

**15** At the original sentencing, the court expressly stated it would exercise no such presumption. Although it did not expressly so state at resentencing, the absence of such presumption is clear from the record, and defendant does not claim otherwise.

**16** Both defendants in *Gutierrez* were 17 at the time of their offenses. One (Gutierrez) was the actual killer; the jury found he stabbed his victim to death during the commission of rape or attempted rape. (*Gutierrez*, *supra*, 58 Cal.4th at pp. 1366-1367.) The other (Moffett) neither killed nor, apparently, intended anyone be killed, but was convicted under the felony-murder rule when his 18-year-old accomplice shot and killed a peace officer as the pair were attempting to escape following a robbery. (*Id*. at pp. 1362-1363, 1365.)

full rehabilitation, we reject the notion this somehow means an LWOP term cannot properly be imposed under California law or the Eighth Amendment.

Defendant's argument is that he has not been shown to be "'the rare juvenile offender whose crime reflects irreparable corruption.'" (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2469].) He says the trial court's own words — that it would not exclude the possibility defendant had some significant chance of rehabilitation — belie such a conclusion.

The trial court here did not *find* defendant had a significant chance of rehabilitation; it simply refused to rule out the possibility. Because no one can see into the future or predict it with any accuracy, presumably there is always the possibility of rehabilitation — however remote — where a juvenile is concerned. That is the point of *Miller*. Despite this, *Miller* did not say the possibility of rehabilitation overrides all other relevant factors. If the potential for rehabilitation were dispositive — or even the preeminent factor — we do not believe the high court would simply have listed the possibility of rehabilitation as one of several factors applicable to an individualized determination whether to impose LWOP on a juvenile offender. (See *Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2468].) Rather, the court would have held LWOP categorically unconstitutional for juvenile offenders, or at least would have explicitly said such a sentence cannot constitutionally stand in face of a potential for rehabilitation.

That the court expressed belief appropriate occasions for sentencing juveniles to LWOP would be rare because of the difficulty distinguishing "between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption'" (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2469]) does not change this. *Miller* made clear that a sentencer has the ability to make such a judgment in homicide cases (*ibid*.): The decision "mandates *only* that a sentencer follow a certain process — considering an offender's youth and attendant

characteristics — before imposing a particular penalty." (*Id*. at p. ___, italics added [132 S.Ct. at p. 2471, italics added].)

Similarly, in *Gutierrez*, the California Supreme Court stated: "Because Moffett and Gutierrez have been convicted of special circumstance murder, each will receive a life sentence. [Citation.] The question is whether each can be deemed, at the time of sentencing, to be irreparably corrupt, beyond redemption, and thus unfit ever to reenter society, notwithstanding the 'diminished culpability and greater prospects for reform' that ordinarily distinguish juveniles from adults. [Citation.]" (*Gutierrez, supra*, 58 Cal.4th at p. 1391.) Yet the court did not suggest section 190.5, subdivision (b) evinces a preference *for* a sentence of 25 years to life. Rather, the court determined that "[u]nder *Miller*, a state may authorize its courts to impose life without parole on a juvenile homicide offender when the penalty is discretionary and when the sentencing court's discretion is properly exercised in accordance with *Miller*." (*Gutierrez, supra*, at p. 1379.)

The trial court here thoughtfully weighed the applicable factors, particularly defendant's youth and its attendant circumstances, and implicitly concluded defendant was unfit ever to reenter society. We cannot say it exceeded the bounds of reason, all of the circumstances being considered, under section 190.5, subdivision (b). (See *People v. Giminez* (1975) 14 Cal.3d 68, 72 ["discretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered"].)

Moreover, we have subjected the constitutionality of the sentence to our independent review, taking into consideration defendant's age and its hallmark features (*Miller, supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2468]; *Gutierrez, supra*, 58 Cal.4th at p. 1388), record information regarding defendant's family and home environment (*Miller, supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2468]; *Gutierrez, supra*, 58 Cal.4th at pp. 1388-1389), and record evidence and information regarding the circumstances of the murders, including whether substance abuse played a role (*Miller, supra*, 567 U.S. at

25.

p. ___ [132 S.Ct. at p. 2468]; *Gutierrez*, *supra*, 58 Cal.4th at p. 1389). We have considered whether defendant's youth had any effect on how he was charged or whether he was somehow disadvantaged in the criminal proceedings (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2468]; *Gutierrez*, *supra*, 58 Cal.4th at p. 1389), but find no evidence or information suggesting this factor is applicable to defendant's case. Finally, we have examined the record for any evidence or other information bearing on the possibility of rehabilitation. (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2468]; *Gutierrez*, *supra*, 58 Cal.4th at p. 1389.) Other than defendant's age and lack of past criminal history, we find none — only speculation.[17] Speculation is insufficient to render unconstitutional a sentence that otherwise passes constitutional muster.

As required by *Miller*, the trial court here "consider[ed] all relevant evidence bearing on the 'distinctive attributes of youth' … and how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders.' [Citation.]" (*Gutierrez*, *supra*, 58 Cal.4th at p. 1390.) It "'[took] into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' [Citation.]" (*Ibid.*) The sentence it imposed did not violate the federal or state Constitution. (See *Bell v. Uribe* (9th Cir. 2014) 748 F.3d 857, 869-870, petn. for cert. pending, petn. filed May 21, 2014.)

---

**17** Mason's report detailed defendant's chaotic and unfortunate upbringing and environment, and explained how various aspects could affect brain development and behavior. Other than conveying defendant's expression of remorse and desire to be a better person, however, the report did not address any potential for rehabilitation.

**<u>DISPOSITION</u>**

The judgment is affirmed.

_____

DETJEN, J.

WE CONCUR:

_____

GOMES, Acting P. J.

_____

FRANSON, J.