Filed 5/29/15  P. v. Araujo CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>IGNACIO ARAUJO,<br><br>    Defendant and Appellant. | B254812<br><br>(Los Angeles County<br>Super. Ct. No. LA063534) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Susan Speer, Judge.  Affirmed.

Marcia C. Levine, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Shawn McGahey Webb and Mary Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Ignacio Araujo raises contentions of sentencing error following his conviction of first degree murder, premeditated attempted murder, and shooting at an inhabited dwelling, with enhancements for personal firearm use and gang-related activity.

For the reasons discussed below, the judgment is affirmed as modified.

## BACKGROUND

In our initial opinion in this matter (*People v. Araujo* (Mar. 17, 2013, B235844) [nonpub. opn.] (hereafter, *Araujo I*)),[1] we vacated Araujo's sentence of 75 years to life, plus life because he was only 16 years old when he committed the crimes. We directed the trial court to resentence Araujo due to recent changes in Eighth Amendment doctrine regarding the proper factors to be considered when sentencing juvenile offenders.

## FACTUAL BACKGROUND

As set forth in our initial opinion in this matter, the facts underlying Araujo's convictions were these.

1. *Prosecution evidence.*

On October 23, 2009,[2] Bryan A. lived in an apartment complex on Vanowen Street. Robert R. and Jose A. were friends of Bryan who lived nearby. That afternoon, Bryan, Jose, and Robert were standing in front of the apartment complex when defendant Araujo appeared. Araujo walked up to Robert, pulled a gun from his sweatshirt, pointed it at Robert's head, and asked "Where you from?" When Robert replied, "Nowhere," Araujo said "M.S." and shot Robert in the face from just inches away. Robert fell and Jose started running. Araujo chased Jose and fired three times. One bullet shattered a front window of the apartment complex and landed in the patio. Robert died from his head wound.

---

[1]    We take judicial notice of this unpublished opinion. (Evid. Code, § 452 subd. (d); Cal. Rules of Court, rule 8.1115(b).)

[2]    All further date references are to the year 2009 unless otherwise specified.

2

Matthew Mowry, the dean of students at Birmingham High School, testified that in October 2009 there were problems at the school being caused by a gang rivalry between Mara Salvatrucha (M.S.) and Barrio Van Nuys ("B.V.N."). Mowry said "there always has been" trouble between B.V.N. and M.S.

Vaughn Gaboudian, an officer with the Los Angeles School Police Department, worked at Birmingham High School. He testified there had been on-going campus conflicts between M.S. and B.V.N. at the time of the shooting. Gaboudian was called to the scene of a fight on October 22 where he stopped Araujo, who was running away. Araujo said he belonged to M.S. and he had been having problems with B.V.N. members, but this had only been an argument, not a fight. The argument started because some B.V.N. members had "jumped him . . . near his apartment building." Araujo was told people from B.V.N. and another gang, 18th Street, "might get him after school" and that they would be "driving around looking for him." When Gaboudian asked if the school had to worry that M.S. would be looking for B.V.N. after school to retaliate, Araujo "said no, because he knows how it works. He said that if he gets into a fight with [the B.V.N. member with whom he had been arguing] . . . they would just be back in school two days later and that he would just blast him when he saw him."

Araujo's friend Jorge testified that a week before the shooting, Araujo had argued at school with Robert, who belonged to B.V.N. Robert insulted M.S. by saying, "Fuck Lamara." After the argument, Araujo asked to borrow Jorge's phone so he could call a friend in Pasadena in order to "feed the beast." Jorge understood this to be a death-related reference apparently aimed at Robert. After the shooting, Araujo told Jorge "he had killed one from Van Nuys." When Jorge said "that wasn't right," Araujo warned him not to say anything or Araujo would kill both Jorge and his mother.

Gang expert Ralph Brown testified B.V.N. and M.S. were rivals at the time of the shooting. When he was arrested, Araujo had various M.S. tattoos on his body, including a fairly recent Devil's Pitchfork tattoo on his arm. M.S. members do not get a Devil's Pitchfork tattoo unless they have committed a violent crime for the gang. By calling out a gang name while committing a crime, the perpetrator is claiming it for the gang.

3

Saying "Fuck Lamara" to an M.S. member would show disrespect and likely incite a violent reaction. "Feed the beast" is M.S. code for an act of violence. Based on a hypothetical question, Brown opined the attack on Robert and Jose had been committed to benefit the M.S. gang.

    2. *Defense evidence.*

    Araujo's mother testified that, in the period of time leading up to the shooting, Araujo had been very frightened. He told her he was being followed by other students who wanted to beat him up. About a month before the shooting, he began refusing to walk or take the bus home from school and she had to pick him up. Someone wrote "187" on her car several times and Araujo told her this was a death threat aimed at him.[3]

    Araujo's girlfriend testified he was one of only two M.S. members at the high school and that students belonging to B.V.N. and other gangs hated him. She had seen death threat graffiti aimed at Araujo. On the day before the shooting, Araujo had argued with rival gang members, one of whom (not Robert) pulled a knife and threatened him. The girlfriend also testified her entire relationship with Araujo had been an elaborate ruse in order to "set him up" for an attack by rival gang members.[4]

    Araujo testified in his own defense. He had joined M.S. when he was nine years old. If he left the gang he would be killed. He was one of only two M.S. members at the high school and there were at least ten B.V.N. members at school. They were threatening him and he lived in B.V.N. territory. He wanted to move, but his mother could not afford to do so. Death threats had been written on his mother's car and in graffiti in the neighborhood.

---

[3]    Section 187 is the Penal Code statute outlawing murder. All further statutory references are to the Penal Code, unless otherwise specified.

[4]    Araujo's girlfriend testified: " . . . I had to go out with him, get to know him better, and at last set him up with the people from the B.V.N. and B.B.S. [the Bad Boys gang] and with 18th Street. All three main gang members [*sic*] wanted to . . . get [Araujo]."

Jose was a member of the Bad Boys gang.  Robert was a member of the B.V.N. gang and was always in Jose's company.  In the months leading up to the shooting, Araujo was becoming more frightened.  About three weeks before the shooting, a car had slowed down next to him and someone inside pointed a gun at him:  "They wanted to shoot but the bullet didn't come out."  In the week before the shooting, Robert and Araujo traded gang insults.  During the incident on October 22, Robert and Jose were among those trying to assault Araujo.   He did not recall telling the school security officer "I'll just blast them when I see them," although it was possible he had said this.

Araujo testified that on the day of the shooting, the other M.S. member at school "came and he talked to me like frightened and he said they are looking for us."  After school, some of Araujo's M.S. friends gave him a gun for protection.  He was in a car with them when they gave him the gun.  Then they kicked him out of the car and he started walking down Vanowen Street to a friend's house.  Coincidentally, he had to go past Jose's apartment complex.  As he was walking he saw Robert standing just 10 feet away.  Araujo described the shooting:

"A.  Well, I felt that if I turn around, they could see me and they could shoot at me.

"Q.  And what happened next?

"A.  Well, I saw that Jose saw me and I got frightened and I went towards where Robert was and I pulled out the gun.

"Q.  And then what happened?

"A.  I shot Robert.

"Q.  And then did you shoot at Jose?

"A.  Yeah, because I thought I saw he was going to grab something.  He was near a car and I saw he was going to grab something and I was frightened."

Araujo acknowledged he received new gang tattoos after the shooting, but his friends had tattooed him without his permission while he was high on drugs.  Araujo did not say anything to Jorge about "feeding the beast" or about having shot Robert; nor did he warn Jorge to remain silent.

Humberto Guizar, a gang expert, testified Mara Salvatrucha gang tattoos are worn to show pride in the group and are not earned by shooting someone. Before this trial, Guizar had never heard the term "feed the beast." In Guizar's opinion, Araujo shot Robert and Jose out of fear, not because he wanted to benefit his gang: "[H]e was under fire. He's basically an outcast in an area that is alien to him. He's not from this area. He's from . . . an M.S. gang that is primarily located . . . in the city of L.A., downtown. [¶] So once they knew that he was a gang member, they started to basically terrorize him in school every day." "The tagging on his car 187, saying that you are going to get killed, . . . you have to take that very serious when you are involved in a gang and somebody tells you that they are going to kill you and writing on your mother's car. [¶] He was jumped. [¶] Sadly, his own girlfriend was trying to set him up to get him killed. They were . . . trying to kill him. [¶] So when he shot, I believe that he was acting out of . . . fear . . . ."

3. *Araujo's initial sentencing hearing.*

At the sentencing hearing, the trial court announced it had found numerous aggravating factors: "[T]he crime involved great violence, great bodily harm, threat of great bodily harm, and other acts disclosing a high degree of cruelty, viciousness and callousness. The defendant pre-planned his attack, arming himself with a handgun, obtaining the assistance of others, and arranged to be dropped off just a short distance away from where the victims resided. [¶] Without warning, the defendant walked up to the victim Robert . . . , fired into [his] face point blank, killing him where he stood." Araujo then shot at Jose "from behind as he ran for safety. [¶] The defendant fired multiple times at [Jose], firing through the front entrance of [his] apartment building. At least one bullet passed into the building endangering the lives of the residents living there."

The trial court said the victims were "particularly vulnerable. They were defenseless as they were attacked without warning and were unarmed. . . . [¶] The

6

victims were only 15 years old at the time of this incident."[5]  "The manner in which the crime was carried out indicates planning, sophistication, and professionalism.  The defendant pre-planned the attack, presumably using other M.S. gang members to drive him to the scene of the attack armed with a loaded nine millimeter semi-automatic handgun.  And after the murder the defendant was transported to Palmdale presumably by other M.S. gang members."  "The defendant is an admitted M.S. gang member since the age of nine years and was motivated to kill for the benefit of the gang after he was disrespected by the rival B.V.N. gang members at school.  [¶]  The defendant had additional M.S. tattoos applied to his body after the murder was committed."

The trial court found only one factor in mitigation:  "The defendant has no known criminal record."

The trial court ended by saying:  "The defendant has demonstrated a clear disregard for human life and demonstrated his intention to live his life as a proud, violent M.S. gang member.  [¶]  While this court is mindful that the defendant had a very difficult childhood, being born in El Salvador, losing his father at an early age, being jumped into the M.S. gang at the age of nine,[6] and having his mother move to the United States without him, nevertheless the defendant had advantages and choices when he arrived in the United States and could have chosen . . . to leave the gang and lead a law-abiding life.  He chose not to do so.  [¶]  And despite his tender age, the defendant is a vicious killer and a danger to society.  [¶]  For this, there can be no excuse, justification or sympathy."

The trial court then sentenced Araujo as follows.  On count 1, first degree murder (§ 187), the court imposed a term of 25 years to life, plus 25 years to life for the personal firearm use enhancement (§ 12022.53(d)), with a minimum parole eligibility term of 15

---

[5]  Robert was 15; Jose was only 14.

[6]  "To join a gang, the novice gang member is set upon by several members of the gang and has to fight them off; this is called being 'jumped in.' "  (*People v. Lopez* (2013) 56 Cal.4th 1028, 1036, fn. 3.)

years for the gang enhancement (§ 186.22, subd. (b)).  On count 2, premeditated attempted murder (§§ 664, 187), the court imposed a consecutive life term, plus 25 years to life for the firearm use enhancement (§ 12022.53).  The trial court stayed imposition of sentence on count 4, shooting at an inhabited dwelling (§ 246), under the multiple punishment statute (§ 654).[7]  Araujo's total term was 75 years to life, plus life.

4.  *Our remand for resentencing.*

In our initial opinion in this matter, we affirmed Araujo's convictions, while remanding for resentencing because it did not appear from the record that the trial court gave meaningful consideration to the fact Araujo had only been 16 years old at the time of the shooting.  As we explained in *Araujo I*, the United States Supreme Court has recently expressed concern about sentencing juvenile offenders to prison terms that prevent any possibility of rehabilitation and eventual release.  In *Roper v. Simmons* (2005) 543 U.S. 551 [125 S.Ct. 1183] (*Roper*), the court held that juveniles must be treated differently than adults when it comes to sentencing.  "*Roper* established that because juveniles have lessened culpability they are less deserving of the most severe punishments.  [Citation.]  As compared to adults, juveniles have a ' "lack of maturity and an underdeveloped sense of responsibility" '; they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.'  [Citation.]  These salient characteristics mean that '[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'  [Citation.]  Accordingly, 'juvenile offenders cannot with reliability be classified among the worst offenders.' . . .  [¶]  Juveniles are more capable of change than are adults, and their actions are less likely to

---

[7]      Section 654, subdivision (a), provides in pertinent part:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

8

be evidence of 'irretrievably depraved character' than are the actions of adults." (*Graham v. Florida* (2010) 130 S.Ct. 2011, 2026 [176 L.Ed.2d 825] (*Graham*).).

*Roper* held the imposition of capital punishment on juvenile offenders for any offense whatsoever violated the Eighth Amendment. *Graham* held the imposition of a life-without-possibility-of-parole sentence on a juvenile offender for a non-homicide offense violated the Eighth Amendment. *Miller v. Alabama* (2012) 132 S.Ct. 2455, 2469 [183 L.Ed.2d 407] (*Miller*), held "the Eighth Amendment forbids a sentencing scheme that *mandates* life in prison without possibility of parole for juvenile offenders," although a trial court could in its discretion impose such a punishment. (Italics added.) In *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), our Supreme Court concluded that, under the reasoning of these United States Supreme Court cases, "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment." (*Id*. at p. 268.)

*Caballero* noted that *Miller* had "extended *Graham*'s reasoning (but not its categorical ban) to homicide cases . . . ." (*People v. Caballero*, *supra*, 55 Cal.4th at p. 267.) *Caballero* pointed out that *Miller* "also observed that 'none of what [*Graham*] said about children – about their distinctive (and transitory) mental traits and environmental vulnerabilities – is crime-specific. Those features are evident in the same way, and to the same degree, when . . . a botched robbery turns into a killing. So *Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses.' [Citation.]" (*Ibid*.)

Araujo was sentenced on September 7, 2011, before either *Miller* (decided June 25, 2012) or *Caballero* (decided August 16, 2012) was decided. The trial court's explanation for imposing the functional equivalent of a life-without-possibility-of-parole term was almost entirely taken up with an enumeration of the aggravating factors warranting a long sentence. The court made no more than a passing express reference to Araujo's juvenile status when it said, "And despite his tender age, the defendant is a vicious killer and a danger to society." This record did not demonstrate the trial court

9

had given meaningful consideration to the factors subsequently discussed in *Miller* and *Caballero*. The trial court undoubtedly had discretion to impose a sentence amounting to life without possibility of parole, but it could not do so without considering those factors.

Given these circumstances, we vacated Araujo's sentence and remanded to the trial court for resentencing in accordance with the guidelines set forth in this new case law. We expressed no opinion as to how the trial court should weigh the factors discussed in *Miller* and *Caballero*, or as to how long Araujo's sentence should be.

5. *Proceedings on remand.*

On remand, Araujo filed a sentencing memorandum which included an expert report from Efty Sharony, a social worker at the Center for Juvenile Law and Policy at Loyola Law School (Center).

a. *Social worker's mitigation report.*

Sharony teaches law students enrolled in the Center's clinical program about the psychosocial issues related to juvenile offenders. She interviewed Araujo a number of times, spoke to his family members, and reviewed various written records.

Sharony's report discussed the neuroscience of adolescent brain development, noting that "even in normal adolescent brain development maturation doesn't really occur until the age of 25," while "[c]omplex trauma in youth stunts and delays emotional as well as intellectual development. Research indicates that maternal abandonment is very traumatizing to one's development." Sharony stated, "[A]s risk factors accumulate, there is an increase to an individual's vulnerability to adverse outcomes. A review of [Araujo's] development shows that almost every type of known risk factor was present."

Sharony described Araujo's childhood in civil war-torn El Salvador in the midst of an on-going conflict between the M.S. and 18th Street gangs. "When [Araujo] was 6 years old his mother left him in El Salvador under the care of his alcoholic father. At the age of 8, [Araujo's] father disappeared. His body was discovered 3 weeks later. At the age of 9, [Araujo] was 'jumped' into M.S." He engaged in criminal activity for the gang's benefit, witnessed much violence, and "was exposed to myriad traumatizing

events during this time." Sharony stated, "It is well documented that the gang often becomes the primary family for children in situations similar to [Araujo's]."

At age 11, Araujo and a younger sister were sent to live with their mother in California. The children were illegally transported by guides or " 'coyotes' " over a three-week period through Guatemala, Mexico and Texas. They were intercepted by immigration authorities in Texas and detained until their mother could obtain their release. Sharony characterized this as "a very traumatizing experience" for Araujo. Because his mother lived in a neighborhood controlled by the Barrio Van Nuys Surenos gang, which was hostile to M.S., Araujo was constantly harassed. Threatened in school and in his own neighborhood, he believed rival gang members were out to murder him and this led directly to the crimes for which he was convicted.

Sharony opined: "There are a number of risk factors that have been scientifically established as determinants for gang involvement. Unfortunately, [Araujo] did not possess any resiliency factors and basically had ALL of the adverse risk factors. He was in survival mode. His gang membership is actually a mitigating circumstance. He had an inability to resist the peer pressure of the gang who had been the constant presence in his short life."

Sharony ended her report by discussing Araujo's "current situation":

"In my capacity as a mitigation expert . . . I have interviewed and worked with prisoners who have spent on average 20 years in custody. The vast majority were convicted of gang related murders and have since then become entirely different people who are no longer operating under the cloud of youth and gang membership. Many have made remarkable strides in becoming educated and rehabilitated in spite of their lengthy sentences. [¶] This is my hope for Ignacio Araujo. He has already started the path to rehabilitation during his time in prison. He reports that he has embraced his religion, and identifies himself as a Christian now. He participates in church and religious education

11

services whenever possible. He also reports only having two 115 violations,[8] neither violent. This is remarkable because it [is] extremely difficult for young people, particularly ones with life sentences to adjust to prison life. Often because of their weakness and vulnerability they are placed in a position where they become even more aggressive. I believe that these are the beginning signs of [Araujo's] rehabilitation."

Sharony concluded her mitigation report by urging that Araujo's sentence be significantly reduced in order to facilitate his participation in the kind of prison programming[9] that will enable him "to properly exhibit rehabilitation and remorse. We must take into account the over-stimulated hypersensitive state [Araujo] was in at the time of the crime when considering his culpability. Most importantly, his youthfulness and history of significant trauma, including parental abandonment, being jumped into a violent gang at such a young age, and living in such a violent war torn country meet the criteria for him to receive a reduced sentence, and a meaningful opportunity for parole."

b. *Araujo's resentencing.*

After indicating that it had read the resentencing memoranda as well as Sharony's expert report, the trial court sentenced Araujo for the second time. As before, the court found numerous aggravating factors, including the following: the crime involved great violence, cruelty, and callousness; the young victims were particularly vulnerable; the manner in which the crimes were carried out demonstrated planning, sophistication, and professionalism; Araujo was "motivated to kill for the benefit of the gang after he was disrespected by rival . . . gang members at school;" and Araujo "has demonstrated a clear

---

[8] "According to the California Code of Regulations, a CDC 115 [California Department of Corrections Rule Violation Report] documents misconduct believed to be a violation of law which is not minor in nature." (*In re Gray* (2007) 151 Cal.App.4th 379, 389.)

[9] Sharony stated Araujo "is in the highest level of security[,] a level IV currently. If his sentence were to be lowered significantly, he would remain at a level IV but will have the opportunity to move to a level III with good behavior. On a level III yard he would be eligible for programming such as Gangs Anonymous, Cage the Rage (Anger Management), and be able to participate in religious programming."

12

disregard for human life and . . . his intention to live his life as a proud, violent M.S. gang member."

As a factor in mitigation, the trial court again noted Araujo did not have a prior criminal record.

The court then stated it had taken into consideration the recent case law we cited in *Araujo I*, recognizing that the Eighth Amendment "requires that juveniles be considered differently than adults for sentencing purposes" and "forbid[s] the imposition of . . . the functional equivalent of [a life-without-possibility-of-parole term] . . . without consideration of these differences." The court acknowledged that this recent case authority had "enumerated salient characteristics of juveniles differentiating them from adults for consideration at sentencing including: [¶] lack of maturity and undeveloped sense of responsibility; [¶] increased vulnerability to negative influences including peer pressure; [¶] immature character development; [¶] tendency to be impetuous; [¶] failure to appreciate risks and consequences; [¶] the ability to change over time. [¶] The court is also instructed to weigh the juvenile's family and home environment from which the juvenile could not extricate himself no matter how brutal."

The trial court then stated it had "considered these factors for the purpose of re-imposing sentence today as the defendant was 16 years old at the time of the commission of these offenses. [¶] The court is mindful that the defendant was jumped into Mara Salvatrucha . . . at the age of nine while living in war torn El Salvador. [¶] His mother left him at the age of six, came to the United States and left him with his alcoholic father, who was killed when the defendant was only eight years old. [¶] The defendant and his sister did not join his mother in the United States until the age of 11. [¶] He was enrolled in public school with few M.S. gang members mixed in with a greater number of rival Barrio Van Nuys and other rival gang members. [¶] There had been problems between the two gangs on campus and some evidence that the defendant had a verbal altercation with murder victim Robert R[.], who disrespected M.S. This verbal altercation nearly resulted in a physical confrontation with the defendant and victims Robert R[.] and Jose A[.]. [¶] There was also evidence that the defendant was fearful for his life and

13

received previous death threats from rival gang members . . . . [¶] The defendant testified that he lived in B.V.N. territory and wanted to move, but his mother could not afford it. [¶] There were other . . . threats and challenges to this defendant prior to the murder, which were not testified to at trial . . . but are outlined in Ms. Sharony's sentencing memorandum. [¶] And despite the defendant's tender age, he was a vicious killer and a danger to society. [¶] For this there could be no excuse, justification or sympathy, but a sentence will be reduced accordingly in view of the law pertaining to the sentencing of juveniles."

The court then imposed a total sentence of 50 years to life, which was a reduction from Araujo's original sentence of 75 years to life, plus life. This new sentence consisted of the following: On count 1, a 25 years-to-life term for murder, with a consecutive 25 years-to-life term for the personal firearm use enhancement. On count 2, a straight life term for premeditated attempted murder, with a consecutive 25 years-to-life term for the personal firearm use enhancement; count 2 to be served concurrently with the sentence imposed on count 1. On count 4, the conviction for shooting at an inhabited dwelling, the court imposed a five-year term plus 25 years to life for the personal firearm use enhancement, but stayed the sentence on this count under section 654.

## CONTENTIONS

Araujo contends (1) his sentence constitutes cruel and unusual punishment, and (2) the trial court miscalculated his prison custody credits.

## DISCUSSION

1. *Araujo's sentence does not constitute cruel and unusual punishment.*

Araujo contends his sentence violates the Eighth Amendment because, contrary to our remand order, the trial court did not give due consideration to the special factors that must be taken into account when sentencing a juvenile offender. He asserts: "Under current authority, the trial court has a choice: either make a finding that a defendant is forever unredeemable, which must be supported by the record, or set a term that allows a realistic opportunity for release. The sentence of 50 years to life . . . was cruel and unusual because it did not allow a realistic opportunity for release and the trial court did

not make a finding that Mr. Araujo . . . was beyond redemption, nor did the record support such a finding." There is no merit to this claim.

Referencing our Supreme Court's statement in *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1389, that "a sentencing court must consider any evidence or other information in the record bearing on 'the possibility of rehabilitation,' " Araujo concedes the trial court "took into consideration circumstances in mitigation related to [his] youth," but argues the court neither considered the evidence relating to rehabilitation, nor found that "appellant was unredeemable." Araujo asserts the trial court erred in "failing to examine [his] potential for reform."

Contrary to Araujo's arguments, however, it is clear the trial court read and considered Sharony's mitigation report which contained a wealth of information regarding Araujo's family and social history, and which made a strong case for the possibility that he could be rehabilitated. The trial court obviously disagreed with Sharony's conclusions and recommendations, and it was the trial court's prerogative to do so as long as it gave proper consideration to the special factors affecting juvenile sentencing. We agree with the Attorney General that, "Based on the record, the trial court gave the requisite consideration to the factors set out in *Graham*, *Miller*, and *Caballero*, including appellant's age, family circumstances, and inability to extricate himself from a threatening environment. . . . In *Miller* the high court did not foreclose a sentencer's ability to determine that a juvenile offender's crime " 'reflects irreparable corruption,' " so long as the sentencer took into account 'how children are different.' (*Miller*, *supra*, 132 S.Ct. at p. 2469.) The trial court here took into account appellant's age and maturity, but nevertheless found that his crimes " 'reflect[ed] irreparable corruption.' " (*Ibid.*)"

Summing up its recent case law discussing juvenile sentencing, the United States Supreme Court said in *Miller*: "[I]n imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult. To recap: Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features – among them, immaturity, impetuosity, and failure to appreciate risks and

15

consequences. It prevents taking into account the family and home environment that surrounds him – and from which he cannot usually extricate himself – no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth – for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Miller v. Alabama*, *supra*, 132 S.Ct. at p. 2468.)

*Miller* then concluded: "[G]iven all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.] Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller v. Alabama*, *supra*, 132 S.Ct. at p. 2469, fn. omitted.) "Our decision does not categorically bar a penalty for a class of offenders or type of crime . . . . Instead, it mandates only that a sentencer follow a certain process – considering an offender's youth and attendant characteristics – before imposing a particular penalty." (*Id*. at p. 2471.)

We are additionally guided by two recent cases applying the *Miller* principles.

In *People v. Jordan* (2015) 235 Cal.App.4th 198, the Court of Appeal held the trial court properly complied with *Miller*'s requirements when it sentenced a juvenile to a term of 50 years to life in a robbery/murder case. The trial court had referenced *Miller* and then discussed such factors as the defendant's age, the circumstances of the crime,

16

the defendant's emotional response to having committed the crime, the defendant's family and social background, and "his maturity level as shown by the evidence." (*Id.* at p. 209.) "Based on all of these considerations, the trial court concluded, 'I do believe that there are some circumstances where 50 to life would be so disproportionate to the conduct involved or given the mitigating circumstances of a juvenile involved that it would be unconstitutional . . . , but this is not one of them.' " (*Id.* at p. 210.) *Jordan* held: "In light of the fact that the trial court undertook a substantive and meaningful analysis of whether, in light of [the defendant's] age at the time of the murder and other related factors, it should impose a sentence of less than 50 years to life, we conclude that the trial court fully complied with the requirements of *Miller*." (*Ibid.*)

In *People v. Palafox* (2014) 231 Cal.App.4th 68, the trial court sentenced a juvenile defendant convicted of special circumstance murder to life without possibility of parole under section 190.5, subdivision (b).[10] On appeal, Palafox argued there was *Miller* error because the trial court said it was not excluding the possibility he could be rehabilitated. But the Court of Appeal reasoned: "The trial court . . . did not *find* defendant had a significant chance of rehabilitation; it simply refused to rule out the possibility. Because no one can see into the future or predict it with any accuracy, presumably there is always the possibility of rehabilitation – however remote – where a juvenile is concerned. That is the point of *Miller*. Despite this, *Miller* did not say the possibility of rehabilitation overrides all other relevant factors. If the potential for rehabilitation were dispositive – or even the preeminent factor – we do not believe the high court would simply have listed the possibility of rehabilitation as one of several

---

[10] Section 190.5, subdivision (b), provides: "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances enumerated in Section 190.2 or 190.25 has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life." In *People v. Gutierrez*, *supra*, 58 Cal.4th 1354, our Supreme Court disapproved reading into this statute any presumption in favor of the life-without-possibility-of-parole term as unsupportable in light of the high court's reasoning in *Miller*.

17

factors applicable to an individualized determination whether to impose [life without possibility of parole (LWOP)] on a juvenile offender. [Citation.] Rather, the court would have held LWOP categorically unconstitutional for juvenile offenders, or at least would have explicitly said such a sentence cannot constitutionally stand in face of a potential for rehabilitation." (*People v. Palafox*, *supra*, at p. 90.) *Palafox* concluded, "The trial court here thoughtfully weighed the applicable factors, particularly defendant's youth and its attendant circumstances, and implicitly concluded defendant was unfit ever to reenter society. We cannot say it exceeded the bounds of reason, all of the circumstances being considered . . . ." (*Id*. at p. 91.)

We conclude the same is true here. Following our remand order, the trial court gave appropriate consideration to the special factors relating to the sentencing of juvenile offenders as set forth in the *Miller* line of cases. The trial court weighed the relevant factors and acted within the bounds of its discretion in imposing a sentence of 50 years to life. We therefore conclude that Araujo's sentence did not constitute an Eighth Amendment violation.

2. *Trial court miscalculated Araujo's prison custody credits.*

Araujo contends he is entitled to an additional 22 days of actual prison custody credits. The Attorney General concedes this claim has merit. "A sentence that fails to award legally mandated custody credit is unauthorized and may be corrected whenever discovered. [Citation.]" (*People v. Taylor* (2004) 119 Cal.App.4th 628, 647; see also *People v. Acosta* (1996) 48 Cal.App.4th 411, 428, fn. 8 ["The failure to award an adequate amount of credits is a jurisdictional error which may be raised at any time."].)

Araujo was arrested on December 2, 2009, and was resentenced on February 13, 2014, a total of 1,535 days. However, the trial court awarded him only 1,513 actual days of prison custody credit. Hence, Araujo is entitled to an additional 22 days of custody credit.

18

## DISPOSITION

The judgment is affirmed as modified. Araujo is entitled to 22 additional days of actual prison custody credit. The trial court is directed to prepare and forward an amended abstract of judgment to the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

ALDRICH, J.

EGERTON, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.