Filed 9/1/16  P. v. Robinson CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KENYUN ROBINSON,<br><br>    Defendant and Appellant. | B264801<br><br>(Los Angeles County<br>Super. Ct. No. NA051400) |

APPEAL from an order of the Superior Court of Los Angeles County. Laura Laesecke, Judge.  Affirmed.

Center for Juvenile Law and Policy, Sean Kennedy, Lindsey Cerny and Patrice Corpus for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stephanie A. Miyoshi and William N. Frank, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 2003, defendant Kenyun Robinson was convicted of a special circumstance murder he committed while 16 years old. Defendant was sentenced to life in prison without the possibility of parole (LWOP), plus four years for personal weapon use. In 2013, defendant filed a petition for writ of habeas corpus, seeking resentencing pursuant to *Miller v. Alabama* (2012) 132 S. Ct. 2455 (*Miller*) and *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*). The trial court held a hearing, considered the sentencing factors outlined in *Miller,* and determined that defendant's originally imposed sentence was appropriate. We affirm.

## BACKGROUND

### The events of October 18, 1992[1]

On October 18, 1992, defendant, who was 16 years old, was standing with several others near a liquor store in Long Beach, when two teenage twin brothers, Jason and Robert Kennedy, approached the store. Defendant walked up to Jason, put a gun to his back, and told Jason to give him all of his money or he would blow him away. Jason grabbed the gun and twisted it to point at defendant's face. He took the gun from defendant's grasp but then gave it back to him and went into the liquor store. After leaving the liquor store, Jason was again threatened by defendant, who put the gun to the back of Jason's head. Jason went home and told his aunt about the incident.

That afternoon, Jason and Robert were at home when they heard a gunshot. They ran toward the front of their house and saw defendant take a purse from a lady who was holding her neck. Defendant ran away and the woman, who was later identified as Matilda Martinez, struggled to walk and then fell. Martinez died from a gunshot wound to the neck.

Defendant was apprehended later that night by Long Beach Police Officer Jacinto Ponce. Gunshot residue was collected from defendant's hands. Defendant was lined up

---

[1] These facts, and the facts relating to the underlying conviction and sentence, are taken primarily from the opinion in defendant's prior appeal (*People v. Robinson* (Jun. 2, 2004, B166845) [nonpub. opn.]), of which we take judicial notice.

2

for possible identification, and Jason and Robert both said words to the effect of "Yeah, that's him" upon viewing defendant. They both meant that defendant was the person involved in the attempted robbery of Jason and the shooting of Martinez. Officer Ponce, however, believed the Kennedys were merely identifying the person who attempted to rob Jason. Ponce did not know the Kennedys had witnessed defendant's altercation with Martinez or that defendant was a suspect in the murder.

Defendant was committed to the California Youth Authority in connection with the attempted robbery.

**Underlying conviction and sentence**

In 2000, Detective Paul Edwards began looking at the unsolved killing of Martinez. He contacted Jason Kennedy, who told him that the person who tried to rob him was the same person involved in the shooting of Martinez. In 2001, defendant was questioned about the incident. He said he did not shoot anyone, and could not remember anything from 1992 because it was such a long time ago. He later said that he was arrested because "some white guy" accused him of robbery. He said that he could not remember anything else about the attempted robbery because, back in 1992, he was high on "sherm" (PCP-laced cigarettes) and other drugs.

Detective John Boston testified that he interviewed Trinidad Bedolla around the time of the murder. Bedolla was 11 or 12 years old at the time and knew defendant. According to Detective Boston, Bedolla said that defendant showed him a small gun shortly before accosting Jason Kennedy. Later that day, Bedolla was walking with defendant and another individual when defendant said, "Wait here, watch this." Defendant approached a lady, grabbed her purse, and started to pull it. She pulled back and he shot her and then ran away. Bedolla later said that everything he told Boston about the shooting was a lie and he had not really seen it. At trial, Bedolla only testified that he heard a gunshot and saw a woman lying on the ground, not that he saw defendant shoot her.

In 2003, defendant was convicted of the murder of Martinez in violation of Penal Code section 187, subdivision (a).[2] The jury found true allegations of personal weapon use (§ 12022.5, subd. (a)) and the special circumstance of robbery (§ 190.2, subd. (a)(17)). The trial court sentenced appellant to LWOP plus four years for the weapon use. We affirmed the judgment in 2004.

## Resentencing memoranda

Defendant, acting in propria persona, filed a petition for writ of habeas corpus with the trial court in July 2013. The court set a resentencing hearing.

In April 2015, defendant, having obtained counsel, filed a sentencing memorandum urging the trial court to resentence him to 29 years to life, in light of *Miller* and *Gutierrez*. The memorandum argued that Robinson was exceedingly immature at the age of 16, that he was a heavy PCP user at the time, that he was unable to deal with police and assist his counsel, that he suffered physical and sexual abuse at the hands of his family, that his family members revered criminal lifestyles, that he lacked criminal sophistication, and that he had demonstrated he was amenable to rehabilitation.

In support of his memorandum, defendant attached a number of documents relating to his upbringing, including: an undated and unsworn statement from Dannie McKinley, stating that defendant's older brother Antoine had given him and defendant marijuana and forced them to perform oral sex; an undated and unsworn statement from defendant's cousin Donald Hammond, stating that when he and defendant were young, they would sit around listening to their relatives glorify the gang lifestyle, and that the relatives drank and used drugs; a declaration by Rayshawn Session, defendant's cousin, also recounting how family members used drugs and how the children, including defendant, had no adult supervision; a declaration by defendant's uncle, Charles Hammond, stating that Hammond was constantly in trouble with the law when younger and would reminisce with relatives in front of the children, including defendant, how they

---

[2]    Unless otherwise specified, all further statutory references are to the Penal Code.

lived a life of violence; and a "social history," stating that defendant was not favored by his family, that he joined a gang to gain acceptance, that defendant's mother and stepfather used marijuana and crack cocaine, that most of defendant's family members had been incarcerated, that much of the family had mental health problems, that defendant was easily influenced by peers, that he was low-functioning educationally, and that he frequently smoked marijuana. Defendant also submitted a declaration by defendant's older brother, Antoine Owens, stating that defendant was arrested for snatching purses in 1992, but the purses found by police were his and not defendant's, and a declaration by Bedolla, who stated he was pressured by the police to say he witnessed the shooting of Martinez, when he really did not.

In addition to these documents, defendant attached a neurocognitive evaluation summary prepared by a licensed psychologist, based on interviews with defendant and review of relevant records. According to the evaluation, defendant began using marijuana and PCP by the age of 12 or 13. He stopped attending school regularly in the seventh grade and frequently stayed away from home. The evaluation noted that defendant's probation and prison records showed no mental health issues, though a probation officer's report from 1992 stated that defendant "may even meet the criteria of developmentally disabled." Defendant, however, scored in the "low average range" on a test of intellectual functioning and performed in an unimpaired fashion on a reading comprehension and accuracy test. The psychologist concluded that defendant did not have an intellectual disability, but could suffer from a mild neurocognitive disorder caused by substance abuse and multiple head injuries. The psychologist further opined that defendant did not exhibit diagnosable levels of depression, but may experience post-traumatic stress disorder due to witnessing, at a young age, his grandmother stab his grandfather and other violent acts, being sexually abused by his older brother, and undergoing strict corporal punishment.

Defendant also submitted exhibits relating to his criminal history and experience in the justice system. Defendant had an extensive juvenile arrest record. A lengthy November 1992 probation report—pertaining to the October 18, 1992 attempted robbery

5

of Jason Kennedy—noted that defendant had "good" mental health and denied having any problems with alcohol or drugs. The report stated that defendant had not made serious efforts to enroll or stay in school, and had not spent "any considerable time" in school over the previous two to three years. According to a 1993 report, defendant had tried PCP two to three times, and he denied being under the influence of drugs or alcohol at the time of his "commitment offense." In the report, defendant described his childhood as "bad and happy," bad because of "all the stuff I did," and happy because of many opportunities to participate in family activities such as going to Knott's Berry Farm. In the 1992 report, defendant was described in the report as a "potentially dangerous individual," who had "low self-esteem, little motivation, and little awareness of his responsibilities to himself and society as a law-abiding member." In the opinion of the probation officer, defendant was "much too sophisticated[] in terms of the nature of the current offense . . . ," and his criminal sophistication was "seen as being moderate to high."

In response to defendant's request for resentencing, the prosecution filed a sentencing memorandum agreeing that defendant was entitled to a new sentencing hearing, at which the trial court was required to consider the analysis set forth in *Miller*, *Gutierrez*, and similar authority. The prosecution argued, however, that under the controlling legal authority, a sentence of LWOP, plus four years, was still appropriate. Even if defendant's post-conviction conduct could be considered, according to the prosecution, it did not weigh in favor of a lesser sentence, as defendant had been found guilty of at least six rule violations while in prison, including fighting, battery on a prisoner, and possession of an inmate-made weapon.

**Resentencing hearing**

At the hearing, the trial court noted that it read and considered all materials presented with the sentencing memoranda. In announcing its tentative ruling to reimpose a sentence of LWOP, the court stated it had "considered the various five requirements of *Miller*."

6

The defense then called a "mitigation specialist," Efrat Sharony, to testify regarding defendant's childhood, as recounted by family members in interviews. Sharony created the "social history" submitted by defendant. She testified that, in her "many years" working with teenage defendants, "this is one of the most severe traumatic and dysfunctional family situations that I have read about." The interviews revealed that defendant's parents were both addicted to drugs, family members were deeply involved in criminal behavior, and defendant's older brother, Antoine, inflicted sexual and physical abuse. According to Sharony, defendant used PCP "pretty regularly" in the months before his arrest at 16. She opined that defendant's troubled background was the "main factor" in the crime.

The defense then argued that defendant had diminished culpability at the time the homicide was committed based on his age, educational difficulties, the abuse by his older brother, and his use of PCP. The trial court expressed skepticism of the recent evidence submitted by defendant, noting that essentially none of the facts recently attested to was present in the probation reports generated when defendant in the juvenile justice system.

After hearing argument, the trial court determined that LWOP, plus four years, was the appropriate sentence. It found that, at 16, defendant was able to appreciate the risks involved in committing the crime. Defendant already had a background with the criminal justice system, told a companion to "watch this" prior to shooting Martinez, and earlier that day had pointed a gun at and tried to rob someone else. The court stated that the murder was "particularly callous," and defendant appeared to act with an intent to shoot. The court also found that defendant knew to withhold information and would not admit to things that he thought would hurt him. It did not find support for claims of extreme abuse or neglect in the family environment; instead, according to the probation reports, when defendant was outside of the family home and in a suitable placement, he continued with criminal behavior and refused to go to school. The court further found that defendant did not have a problem with PCP, as the probation reports stated he only tried it a few times, and defendant had stated he was not on PCP on the day of the murder. The court determined there was no support for the assertion that the homicide

7

was committed as a result of peer pressure, either at the direction of defendant's older brother or by fellow gang members. It saw no possibility that defendant could have been convicted of a lesser crime, and he was well experienced with the justice system by the time he went to trial. Finally, the court found no possibility of rehabilitation, stating that defendant was an entrenched gang member and "had no interest" "in changing his ways."

Defendant timely appealed.

## DISCUSSION

"Whether a punishment is cruel and/or unusual is a question of law subject to our independent review, but underlying disputed facts must be viewed in the light most favorable to the judgment." (*People v. Palafox* (2014) 231 Cal.App.4th 68, 82 (*Palafox*).) Upon considering the factors enunciated in *Miller* and the relevant evidence, the trial court has discretion to determine whether LWOP is an appropriate sentence for a juvenile offender. (*Gutierrez*, *supra*, 58 Cal.4th 1354, 1380; *Palafox*, at p. 91 [trial court did not "exceed[] the bounds of reason" in imposing LWOP]; see also *People v. Sandoval* (2007) 41 Cal.4th 825, 847 [sentencing decisions subject to abuse of discretion review].)

## I. Applicable legal principles

In *Miller*, the United States Supreme Court held that laws imposing mandatory LWOP sentences on juvenile homicide offenders violated the Eighth Amendment's prohibition against "'cruel and unusual punishments.'" (*Miller*, *supra*, 132 S.Ct. 2455, 2460.) This holding built on other Supreme Court decisions examining the often lower level of culpability present in youthful offenders, including *Roper v. Simmons* (2005) 543 U.S. 551, in which the high court determined the Eighth Amendment prohibits imposition of the death penalty for a crime committed by a person under the age of 18 (*Roper*, at p. 568), and *Graham v. Florida* (2010) 560 U.S. 48 , where the court concluded the Eighth Amendment forbids sentencing a non-homicide juvenile offender to LWOP (*Graham*, at p. 82).

The *Miller* court, in explaining its holding, wrote: "*Graham*, *Roper*, and our individualized sentencing decisions make clear that a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible

8

penalty for juveniles." (*Miller*, *supra*, 132 S.Ct. 2455, 2475.) The court did not "foreclose a sentencer's ability" to determine that LWOP is an appropriate sentence for a juvenile who commits murder. (*Id.* at p. 2469.) Instead, its decision "mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." (*Id.* at p. 2471.) That process involves the consideration of five factors: (1) the defendant's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) "the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional"; (3) "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him"; (4) "that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys"; and (5) "the possibility of rehabilitation." (*Id.* at p. 2468.)

In *Gutierrez*, the California Supreme Court determined that California's statutory scheme for sentencing 16- and 17-year-olds convicted of special circumstance murder does not violate the Eighth Amendment because a sentence of LWOP is discretionary, not mandatory. (*Gutierrez*, *supra*, 58 Cal.4th 1354, 1360-1361 [construing § 190.5, subd. (b)].) Properly construed, the sentencing standard created by section 190.5, subdivision (b), allows a sentence of either 25 years to life or LWOP, with no presumption in favor of LWOP. (*Gutierrez*, at pp. 1360-1361.) The sentencing scheme "authorizes and indeed requires consideration of the distinctive attributes of youth highlighted in *Miller*." (*Id.* at p. 1361.) Thus, a sentencing court must "admit and consider relevant evidence of" the five *Miller* factors. (*Gutierrez*, at pp. 1388-1389.) In considering the pertinent factors, "a sentencing court has discretion under *Miller* to decide on an individualized basis whether a 16- or 17-year-old offender is a '"rare juvenile offender whose crime reflects irreparable corruption,"'" and is therefore deserving of LWOP. (*Gutierrez*, at p. 1380.)

9

In considering the *Miller* factors, and the evidence pertinent thereto, "[n]o particular factor, relevant to the decision whether to impose LWOP on a juvenile who has committed murder, predominates under the law." (*Palafox*, *supra*, 231 Cal.App.4th 68, 73.) "Hence, as long as a trial court gives due consideration to an offender's youth and attendant characteristics . . . it may, in exercising its discretion . . . , give such weight to the relevant factors as it reasonably determines is appropriate under all the circumstances of the case." (*Ibid.*)

## II. Analysis

Based on our review of the record, we find that defendant's sentence is not unconstitutional, and the trial court did not abuse its discretion in sentencing defendant to LWOP.

Defendant argues that the trial court did not consider evidence he presented. The hearing transcript makes clear, however, that the trial court closely reviewed and was familiar with all of the submitted evidence. At the hearing, the court engaged in a lengthy discussion with defense counsel regarding the evidence relevant to the *Miller* factors. In its ruling, the trial court explained, based on its consideration of the evidence and its analysis of the five *Miller* factors, why it determined LWOP, plus four years, to be the appropriate sentence. It found certain evidence not credible, and gave greater weight to evidence present at the time of the murder, in 1992, than more recently created declarations and statements. These determinations of credibility and weight were properly within the trial court's discretion. (*Palafox*, *supra*, 231 Cal.App.4th 68, 82.) Simply because the trial court found certain evidence more compelling than other evidence does not mean that the trial court failed to consider all relevant evidence.

Defendant asserts that the trial court erred by relying on disputed evidence that defendant said "watch this" prior to shooting Martinez. Again, the trial court had discretion to weigh the evidence as it saw fit, and there was substantial evidence that defendant did make such a statement prior to the murder. In any event, this statement was not the only evidence relevant to the third *Miller* factor, the "circumstances of the homicide offense." (See *Miller*, *supra*, 132 S.Ct. 2455, 2475.) As the trial court noted,

10

earlier the same day, defendant held a gun to the back of Jason Kennedy. It further relied on evidence that defendant acted alone in the murder of Martinez, without any apparent peer or familial pressure. Thus, even if the disputed statement of "watch this" was disregarded, substantial evidence would support the trial court's conclusion that the homicide was "particularly callous."

Defendant further argues that the trial court improperly disregarded statements that defendant suffered sexual abuse as a child. At the hearing, the trial court noted that the probation reports (generated in 1992, 1993, 1994, and 1996) contained no indication that defendant had ever suffered sexual abuse. Instead, at the time, defendant described his childhood as "sad" because of his behavior and "happy" because of family activities, and the 1992 report recorded defendant's "physical, mental, [and] emotional health" as "good." At the resentencing hearing, in response to defense counsel's statement that defendant might not have previously revealed the abuse because of shame, the trial court replied it was a "bit skeptical" that the information was only coming forward approximately 20 years later, when defendant was asking to be resentenced. The court noted that the purported abuse also would have been known at the time of defendant's original sentencing for the murder in approximately 2003, but the record of those proceedings contained no evidence of abuse. The trial court's decision not to give significant weight to the allegations of sexual abuse—of which there were no firsthand accounts, other than the recent unsworn statement by McKinley—was not an abuse of discretion.

The trial court also did not err by finding that defendant's PCP use was not a factor in the homicide. A probation report completed shortly after October 1992 stated that defendant had only tried PCP two to three times, and defendant denied being under the influence of drugs at the time of his "commitment offense." Moreover, in the underlying trial in 2003, defendant's mother, Renee Robinson, testified that defendant did not use PCP in 1992.

Defendant further argues the trial court improperly treated defendant's "social history" as aggravating rather than mitigating. The record does not support this assertion.

11

The trial court stated that the family's history of criminal activity "cuts both ways," and "it may be what he aspires to do or be." But the court recognized the negative effects of defendant's family environment—stating that defendant's apparent lack of interest in "changing his ways" was "perhaps . . . part of his family life," and that family members did not "set a good example for him." The court also noted that, even when defendant was not around his family, he continued to engage in criminal behavior. Its decision not to give greater weight to the negative impact of defendant's home environment was a proper exercise of its discretion. (*Palafox*, *supra*, 231 Cal.App.4th 68, 73.)

Defendant next contends that the trial court should have given greater weight to the neurocognitive evaluation prepared in anticipation of defendant's resentencing hearing. At the hearing, the trial court stated: "In this court's view, psychological reports this many years later [are] a snapshot of his current psychological state. It does not tell me what his psychological state would have been at the time he was 16 or at the time of the trial. I rely more heavily on the probation reports, especially those generated because of the attempted robbery. . . . And that tells this court a lot more than any analysis now by a psychologist. . . . That is just sort of the window into my thinking." Defendant argues that the trial court's approach was improper because mitigation that postdates the original trial proceedings is relevant. In support of this assertion, defendant cites to *Montgomery v. Louisiana* (2016) 136 S.Ct. 718, 736, in which the Supreme Court found evidence of the appellant's evolution in prison to a "model member of the prison community" to be "one kind of evidence that prisoners might use to demonstrate rehabilitation." Defendant's neurocognitive evaluation, however, did not demonstrate rehabilitation. Rather, as the trial court noted, it simply opined on defendant's psychological and cognitive state, primarily around the time of the resentencing hearing.

Moreover, the trial court did not err by declining to give more weight to the 1992 probation report's statement that "[t]he minor appears very low-functioning educationally, and may even meet the criteria of developmentally disabled." The psychologist who prepared the neurocognitive evaluation concluded defendant did not have an intellectual disability. And the trial court noted that defendant's educational

12

difficulties may have been caused by his lack of interest in attending school. The 1992 probation report stated defendant had not spent "any considerable time" in school over the previous two to three years, a period that included time when defendant was in a "suitable placement."

Finally, defendant argues that the trial court disregarded *Miller*'s admonition in regard to LWOP that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon," because of the difficulty of distinguishing "between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'" (*Miller*, *supra*, 132 S.Ct. 2455, 2469.) The trial court considered all of the *Miller* factors, however, and complied with *Miller*'s "certain process." (*Id.* at p. 2471.) Its conclusion lies within the bounds of reason; therefore, it is affirmed. (See *Palafox*, *supra*, 231 Cal. App. 4th 68, 91 ["The trial court here thoughtfully weighed the applicable factors, particularly defendant's youth and its attendant circumstances, and implicitly concluded defendant was unfit ever to reenter society. We cannot say it exceeded the bounds of reason, all of the circumstances being considered, under section 190.5, subdivision (b)."].)

## DISPOSITION

The trial court's order, finding defendant's sentence of LWOP plus four years appropriate, is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


                                        BOREN, P.J.

We concur:


ASHMANN-GERST, J.


HOFFSTADT, J.


13