Filed 4/26/22  P. v. Hoffman CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F081577 |
| Plaintiff and Respondent, | |
| v. | (Kern Super. Ct. No. BF125737A) |
| KYLE HOFFMAN, | **OPINION** |
| Defendant and Appellant. | |

-ooOoo-

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  John S. Somers, Judge.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Hill, P. J., Detjen, J. and Franson, J.

**INTRODUCTION**

In 2010, appellant Kyle Hoffman and codefendant Luis Palafox (Hoffman and Palafox; collectively defendants), were convicted after a joint trial of two counts of first degree murder with three special circumstances, and sentenced to two consecutive terms of life in prison without possibility of parole (LWOP).

In 2019, Hoffman filed a petition for resentencing pursuant to Penal Code[1] section 1170.95, and alleged he was entitled to relief because he was not the actual killer, and his murder conviction was based on the felony-murder rule and/or the natural and probable consequences doctrine. The superior court denied the petition.

On appeal, Hoffman's appellate counsel has filed a brief which summarizes the facts with citations to the record, raises no issues, and asks this court to independently review the record. (*People v. Wende* (1979) 25 Cal.3d 436.) We affirm.

**FACTS[2]**

**Evidence Heard by Both Juries[3]**

Early on the morning of August 6, 2008,[4] Bakersfield Police Officer Woessner was investigating an abandoned stolen vehicle when he heard a car alarm coming from the 4400 block of Belle Terrace. He saw Palafox walking away from the vehicle that was emitting the alarm; when Woessner identified himself and asked him to stop, Palafox ran.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

[2] On July 7, 2021, this court granted Hoffman's motion to take judicial notice of the record in defendants' joint direct appeal, *People v. Hoffman* (July 5, 2012, F061127 [nonpub. opn.]) as modified on denial of rehearing, on July 30, 2012.

The following factual and procedural summaries are from the instant appellate record and the record and nonpublished opinion in his direct appeal. As will be explained below, we provide the factual summary for background purposes but will not rely on these facts to resolve the issues presented in this appeal. (See § 1170.95, subd. (d)(3).)

[3] The charges against Hoffman and Palafox were consolidated for trial but separate juries were impaneled. Accordingly, we will indicate which evidence was heard by which jury or juries and will omit the evidence only heard by Palafox's jury since he is not a party to the instant appeal.

[4] Unspecified references to dates are to dates in 2008.

2.

Woessner caught and detained Palafox. Palafox had a dagger with a four-inch long, double-sided blade in his sock. Palafox was arrested for having the knife, which was seized and booked into the police department's property room.

Later that morning, Richard Parrott, the son of Joseph and Dorothy Parrott, received a telephone call from his cousin saying Dorothy had not shown up as scheduled to take Richard's aunt to an appointment.[5] Richard was unable to make telephonic contact with his parents, whom he had last seen on the morning of August 4. As a result, he went to their Bakersfield home. As he approached, he saw that a window had been dislodged from the door on the side of the house. Richard yelled inside the house but, getting no response, went back out front and called his cousin, Gerald Goodell, and asked him to come over.

Goodell arrived a short time later and went to the back of the house, where he found the sliding door open. He and Richard telephoned again and heard the phone ringing inside, but there was no answer despite the fact both cars were in the garage. At that point, Richard called 911.

Officer Knutson and his partner arrived at about 1:45 p.m. After contacting Richard outside, the officers entered through the open rear sliding glass door and conducted a protective sweep of the residence. Knutson observed a small wooden box in the middle of the hallway, with jewelry on the floor next to it. There was nobody in the first bedroom off the hallway. In the second bedroom, he found an elderly male, subsequently identified as Joseph, lying dead on the bed. There was dry blood on his face, the blankets, and the pillow. The pillow was covering his face, and it appeared someone had pushed it down in that position. There were also what appeared to be lacerations to his neck. In the master bedroom, Knutson found an elderly female,

---

[5] For the sake of clarity, the Parrotts will be referred to by their first names. No disrespect is intended.

subsequently identified as Dorothy, lying dead on the bed. A pillow with dried blood on it was covering her face. Her skull was partially crushed in.

There was extensive blood spatter in the rooms in which the bodies were found, especially the one in which Dorothy was located. The cast-off blood stains and arch patterns in both rooms indicated a striking of multiple blows. There was also impact spatter on and above the headboard in the room in which Dorothy was found. Impact spatter results from an object striking a source of exposed blood. There was no trail of blood between the two bedrooms or out of the room in which Dorothy was found. There was no drip trail from the implement used.

Shoe tracks were found in the tile hallway that connected the kitchen, laundry room, garage, and living room area on one end, with the bedrooms and office on the other end. It appeared someone had gone through dressers, nightstands, a file cabinet, jewelry boxes, and a jewelry armoire in various rooms.

Joseph's autopsy revealed that he had eight individual sharp-force injuries along the left side of his neck, ranging in depth from one and a half to three and a quarter inches. Although the stab wounds appeared to have been made by a single-edged implement, this could not be determined with certainty, because the body was going through the stages of decomposition and so the wounds were somewhat dried. Dried edges can make what was caused by a double-edged blade appear to have been made by a single-edged blade. Joseph also had possible defensive wounds on his left hand. The left side of his jaw was fractured, and he suffered a subarachnoid hemorrhage (bleeding between the brain and the skull). Bruising on his left shoulder was linear, suggesting he was struck with a linear object. Death, which was caused by sharp and blunt-force injuries, was not instantaneous.

Dorothy's autopsy revealed that she had trauma to her face and both sides of her head. The left side of her face showed blunt force trauma with linear bruising. The entire right side of her face basically was crushed. She had a large laceration, and her

right eye was pushed backwards into her cranial vault. She had numerous skull fractures, two of which were in a circular pattern, meaning there was an actual impact by an object. That sort of fracture could be consistent with being struck by a linear object such as a baseball bat. Because of the skull fractures, there was tearing of the brain itself. Such crushing of the skull required a significant amount of force. Dorothy also had linear contusions from blunt force trauma to her abdomen, left flank to left shoulder, and right shoulder. The linear bruising observed on Dorothy was similar to that noted on Joseph, and the blunt force injuries to both could be consistent with being caused by the same or a similar type of weapon. Because all the bruises corresponded to extensive hemorrhaging into the soft tissues of the fat of Dorothy's back, it meant her heart was still beating when she received those injuries. In addition, Dorothy had multiple contusions to the upper left arm, just below the shoulder. Some were linear abrasions, but two were in the shape of an inverted C. They could be consistent with the knob end of a baseball bat. The cause of death was blunt force head trauma.

Dr. Wallis-Butler, the forensic pathologist who performed both autopsies, could not give an exact time of death because so many factors came into play. She estimated though that, depending on the environment and based on the bodies' degree of decomposition, death occurred 12 to 36 hours earlier.

On November 23, a search warrant was executed at an apartment in the 4400 block of Belle Terrace in which Hoffman resided. Joseph's state quarter collection was found in one of the bedrooms. Seized from a closet in the same bedroom were a pair of shoes that, although they could not be positively identified as the ones that made the tracks in the Parrotts' hallway, were the same size, had the same or a very similar tread pattern, and had a similar wear pattern.

Also on November 23, a search warrant was executed at the Moreno Valley residence of Palafox's mother. Some of Joseph's rings were found in two of the bedrooms. Palafox was located in Whittier and arrested. The knife seized from him on

August 6 (the morning the bodies were discovered) was examined. DNA analysis showed that a 15-loci genetic profile developed from blood found where the blade met the hilt matched Joseph's genetic profile. The probability of selecting the DNA profile from a population of random unrelated individuals was estimated to be one in 670 quadrillion Caucasians, one in 2.1 quintillion African-Americans, and one in 7.3 quintillion Hispanics.

**Evidence Heard Only by Hoffman's Jury**

As of November, Reginald Cotton and Hoffman had been next door neighbors for about two years. Hoffman had attended church with Cotton on a number of occasions, and Cotton had developed a relationship with Hoffman as his neighbor and spiritual advisor. One day that month, Hoffman asked Cotton if God would forgive him for anything. Cotton asked what Hoffman had done, and if he had murdered someone. Hoffman said he was a part of it. When Cotton asked what he meant by that, Hoffman asked if Cotton knew the old people who were killed and said he and his cousin had done it.[6] Hoffman said they went to a house to break in to get money for drugs. He stayed outside in some bushes while his cousin went inside. Hoffman heard some noises, then his cousin said the coast was clear and Hoffman went inside. Once he walked in, he saw blood and sheets over someone. He was "just numb." Hoffman said he did not know anyone was present in the house until he went in and saw the blood.

Cotton prayed with Hoffman and told him that he needed to do the right thing, which was to tell the police. Hoffman said okay and asked Cotton to go with him to tell his mother. Cotton then went next door and told Hoffman's mother what Hoffman had said. She said she needed to think about what to do.

---

[6] Cotton knew Hoffman's cousin only as "Junior." Cotton had seen him around the apartments and knew him to stay with Hoffman from time to time. Cotton knew the cousin did not live in Bakersfield, but would come up to visit, and had gotten into trouble in August while he was staying there. Junior was a lot bigger than Hoffman, and it appeared to Cotton as though Hoffman "seem[ed] to go along with what Junior wanted."

Later that month, Cotton contacted the police because Hoffman had not done so. Cotton recounted to Detective Murphy, the lead detective on the case, what Hoffman had told him.

Detective Murphy subsequently interviewed Hoffman at the police department. Detective Findley was also present.[7]  After being advised of his rights, Hoffman related that on August 4, he and his cousin, Palafox (whose nickname was Junior and who was actually Hoffman's nephew) were getting high on marijuana and watching movies at Hoffman's apartment.  Palafox then convinced Hoffman to go with him into a house later that night.  At first, Hoffman did not want to go, but he wanted to be "cool" around Palafox since they were the only older boys in the family.

Hoffman related that he and Palafox went to a house.  Hoffman thought Palafox was kidding when he said that, if there were any people, he would take care of them. Hoffman never really believed Palafox.  Hoffman went with Palafox to look for an opening into the house, because there was no car parked outside.  When Palafox suggested they break a window, Hoffman agreed.  Palafox told Hoffman to open the gate and put something there to hold it open, and Hoffman complied without thinking, using a trash can to prop it open.

Hoffman stated that Palafox used a wooden Dodgers baseball bat, which he had brought with him, to push out a window in the kitchen or laundry room door.  Because he was too big to fit through the window, he had the smaller Hoffman go inside with instructions to open the sliding glass door in back.  When Hoffman did not hear any loud voices or noises inside, he opened the sliding door for Palafox, who told him to stay there.  Hoffman waited while Palafox went to take a look.  A few minutes later, Hoffman thought he heard a basketball being dribbled, a child crying, and someone talking. Although nervous and scared, Hoffman stayed where he was.  Palafox then returned with

---

[7] An audio and video recording of the interview was played for Hoffman's jury.

blood on his face and on the "bat."[8]  Palafox warned Hoffman that whatever happened, Hoffman was not to look at the body or tell anybody about this.  Palafox told Hoffman to hold the backpack, to look through two certain rooms, and not to come into two other rooms.

Hoffman related that he did as he was told and found some jewelry and cash, which Palafox told him to put in the backpack.  Palafox told Hoffman to wait there, then went into another room.  After about five minutes, Hoffman also went into the room, and saw a body with the covers over her head and blood.  Palafox was in the bathroom; he had found a lot of jewelry that he put in the backpack.  Palafox said that since Hoffman had seen the one body, they should just go in the other room.  He had Hoffman wait at the door, however, while he covered the body.  Then Hoffman went in, and they both started looking through drawers.

Hoffman said that after they left, they went to a nearby church to split what was in the backpack.  There was more than $200 in cash and quarters in a map of the United States.  Hoffman related that although the cash had been "wasted," he still had the quarters in their cardboard display in his room.  Hoffman said that if he had known beforehand what was going to happen, he never would have gone inside or even agreed.  The day Palafox left, Hoffman threw everything away but the quarter collection.  He went for a drive with a friend and tossed stuff out of the car window every mile or so.  He kept the quarters, however, because his mother had said a complete set could be turned in and would be worth a lot.

Asked if he knew what happened to the baseball bat, Hoffman related that Palafox said he had "went on Parkwood and broke it against the wall and burned it[] with his lighter."  Palafox said the police had the knife he used because they had caught him with it.  As to why they chose that particular house, Hoffman surmised it was because they did

---

**8** Although the transcript reflects Hoffman said "back," our review of the recording suggests he actually said "bat."

8.

not see any car and, when Palafox went to go knock on the front door and ran, no one answered.  Hoffman agreed with Detective Murphy that they were just walking through the neighborhood and happened to see that house without any cars in the driveway.

Detective Murphy inquired why, if Hoffman did not think "this was gonna go this way," he thought Palafox brought a baseball bat and a knife with him.  Hoffman responded that he (Hoffman) lived in a bad neighborhood.  There were a lot of gang members around, most of whom tried to "gang bang" on Hoffman.  Hoffman explained that he was not from anywhere, but just shaved his head sometimes to fit in with his friends, who were all "gang-bangers."  Hoffman related that he had never gone into a house before, although he had heard stories about Palafox and his friends "stalk[ing]" houses where Palafox lived.  Hoffman maintained he did not know at first that Palafox had a baseball bat; Palafox was wearing jeans and a shirt, and Hoffman guessed he had the bat in one of the sides.  Hoffman was wearing jeans and a black shirt.  He threw away the shirt because Palafox said to.  Hoffman was also wearing a jacket; it was still in his room.  He was not about to throw it away because his mother got it for him.  Palafox put gloves and a beanie in the backpack.  Hoffman did not see the gloves until they were about to enter the house.  They put on the gloves then because Palafox said to.

Hoffman admitted that when he and Palafox first left Hoffman's residence, Hoffman knew they were going to see if some cars were unlocked.  Palafox said they were also going to go into a house.  Hoffman had a recollection of talking about going into a house, but thought he disagreed.  He did not remember much when he smoked marijuana.  When he and Palafox left the apartment around midnight, however, he knew they were going to be up to no good.

Asked if they ever discussed what they would do if somebody was in the house or chased them or anything, Hoffman related that Palafox told him, " 'You just run, I'll take care of 'em.' "  Palafox had told him stories many times before about what he did, but it was all a lie.  For instance, Palafox had said he killed a guy on the street in front of a

9.

crowd.  He then said he was just kidding and would not do that.  Palafox always denied being a gang member, but he told Hoffman "he back[ed] up the south the whole way."

Hoffman was adamant that he did not see Palafox hurt either of the victims.  However, Palafox described what he did and how it felt.  Palafox said the old man was sleeping.  Palafox went into his room first and hit him or stabbed him in the throat.  Palafox made it sort of like a joke and told Hoffman, " 'Man, you don't know how hard it is to hit a throat.' "  Palafox described how he hit the man and then stabbed him and then stabbed him again in the throat and twisted and pulled.  He said he then went into the woman's room.  He started swinging down with the baseball bat, and the old woman got up and sort of started screaming.  Palafox said he was not sure if he was hitting her, so he flashed a light, saw her start twitching, and kept on hitting her.  Palafox said he wanted them to feel no pain at all.  Palafox told Hoffman this while they were in the house.  Hoffman estimated they were in there for 15 to 20 minutes at the most, and that it probably happened between midnight and 2:00 a.m.  Palafox told Hoffman not to snitch on him, and he (Palafox) would not snitch on Hoffman, and that if only one got caught, that person should take the whole rap.  Hoffman anticipated that if the detectives told Palafox what Hoffman had told them, Palafox would probably make something up such as saying that Hoffman killed one of the victims.  Hoffman acknowledged it would make more sense if each had killed one, but he almost vomited when he saw the blood.  He insisted he did not kill anyone.

Hoffman related that he had told his mother and Cotton about what happened, and that he told his sister about it before that.  He told his mother because he could not take it anymore.  He had wanted badly to turn himself in, but he was scared.  He intended to turn himself in after Christmas.  Asked how he felt about what he was telling the detectives, Hoffman replied that he was glad he had gotten it off his chest.

Asked about knives found in his room, Hoffman replied that he liked collecting them, especially how sharp they were and how crafted.[9] He thought knives were one of the best weapons there were but did not know why he thought that. He just loved them. He had never used one to hurt somebody.

## PROCEDURAL BACKGROUND

On February 17, 2009, an information was filed that charged defendants Hoffman and Palafox with counts 1 and 2, first degree premeditated murders of Dorothy and Joseph (§ 187, subd. (a)); with the multiple-murder special circumstance (§ 190.2, subd. (a)(3)); the felony-murder/robbery special circumstance (§ 190.2, subd. (a)(17)(A)); and the felony-murder/burglary special circumstance (*id.* at (a)(17)(G)). It was further alleged that both defendants were 16 years of age when they committed the offenses (Welf. & Inst. Code, § 707, subd. (d)(1)).[10]

Hoffman entered into an agreement in which he agreed to plead no contest to one count of murder, in exchange for his testimony against Palafox, and a sentence of 25 years to life. Hoffman subsequently refused to testify against Palofox. His plea agreement was withdrawn, and the prosecution reinstated the offenses alleged in the information.

### Convictions and Sentences

The charges against Hoffman and Palafox were consolidated for trial, but, as explained, separate juries were impaneled.

On August 25, 2010, Hoffman and Palafox were convicted of counts 1 and 2, first degree murder, with the three special circumstances found true.

---

[9] Murphy had been informed that a large number of knives were located in Hoffman's room during the search of his residence. None of the knives were seized.

[10] Hoffman was 17 years old at the time. (*People v. Hoffman*, *supra*, F061127, at p. 17.)

11.

On September 23, 2010, the court sentenced both defendants to two consecutive LWOP terms.

**Direct Appeal**

In 2012, this court filed the nonpublished opinion in defendants' joint direct appeal and affirmed their convictions. We rejected Hoffman's argument that his statements to Mr. Cotton were inadmissible based on an alleged clergy-penitent privilege. We also held Hoffman's pretrial statements were not obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 and were voluntary. Hoffman further argued that CALCRIM No. 400, defining aiders and abettors, misinstructed the jury on the mens rea required for an aider and abettor. We agreed but held the error was harmless.

> "Hoffman's jury was instructed that he could be guilty if he directly committed the crime or if he aided and abetted the perpetrator. The trial court instructed on the general principles of aiding and abetting in accordance with CALCRIM No. 400, as it read at that time, as follows: 'A person may be guilty of a crime in two ways: [¶] One, he or she may have directly committed the crime.… [¶] Two, he or she may have aided and abetted a perpetrator who directly committed the crime. [¶] A person is *equally guilty* of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it. [¶] Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime.' (Italics added.)

> "The trial court further told jurors that Hoffman was being prosecuted for first degree murder under theories of premeditation and felony murder, and it instructed on both. It also instructed on unpremeditated, second degree murder. The court further instructed on the requirement of proof of the union or joint operation of act and specific intent and/or mental state, and on voluntary intoxication. The court told jurors that if they concluded Hoffman was intoxicated at the time of the alleged crime, they could consider such evidence in deciding whether he (1) knew Palafox intended to commit murder, robbery, and/or burglary (robbery and burglary being the felonies underlying the felony-murder theory); (2) intended to aid and abet Palafox in committing murder, robbery, and/or burglary; (3) acted with an intent to kill or with deliberation

12.

and premeditation; and (4) had the specific intent required for robbery and/or burglary." (*People v. Hoffman*, *supra*, F061127, at pp. 29–30.)

We held the "equally guilty" language in the instruction was ambiguous and potentially misleading, but the instructional error was harmless because "reasonable inferences could be drawn from the evidence such that jurors could have found Hoffman to be a direct perpetrator. If jurors so found, then error in an instruction concerning aiding and abetting would have had no effect regardless of whether jurors based their finding of first degree murder on a theory of premeditation, felony murder, or both." (*People v. Hoffman*, *supra*, F061127, at p. 33.)

We further held that based on the true findings on the robbery and burglary felony-murder special circumstances, "jurors rejected the notion that Hoffman lacked the specific intent required for burglary and robbery due to voluntary intoxication. Once they found he committed those felonies, whether as the direct perpetrator, an aider and abettor, or some amalgam of both [citation], it necessarily followed as a matter of law that the resultant homicides were murders in the first degree, and so the challenged portion of CALCRIM No. 400 had no effect…. [¶] [T]he fact CALCRIM No. 400 might have been misinterpreted with respect to premeditated murder is immaterial: The verdicts and true findings establish that the jury convicted Hoffman of first degree murder under a felony-murder theory, at a minimum, regardless of whether they even reached the question of premeditation. [Citations.]

"*Finally, and even assuming they reached the premeditation theory and determined Hoffman was Palafox's accomplice rather than a direct perpetrator, jurors necessarily found Hoffman acted willfully with intent to kill*: They were instructed, pursuant to CALCRIM No. 521, that the defendant acted willfully if he intended to kill; and, pursuant to CALCRIM No. 702, that in order to find a multiple-murder special circumstance true as to a nonkiller, they had to find the defendant acted with the intent to kill. Because jurors found true the multiple-murder special circumstance, they

13.

necessarily determined Hoffman, assuming he was not the actual killer, had the specific intent to kill. [Citation.] They also necessarily found he acted deliberately and with premeditation. CALCRIM No. 401 required jurors to find the perpetrator committed the crime, the defendant knew the perpetrator intended to commit the crime, the defendant intended to aid and abet the perpetrator in committing the crime either before or during the crime's commission, and the defendant's words or conduct in fact aided and abetted the perpetrator's commission of the crime. The instruction further explained that '[s]omeone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to and does in fact aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime….' " ((*People v. Hoffman*, *supra*, F061127, at pp. 34–35, italics added.)

This court also held the two felony-murder special circumstances were supported by substantial evidence. In doing so, we noted that "[a]lthough conceding he was a major participant in burglary and robbery, Hoffman contends the evidence presented at trial was insufficient to establish he aided and abetted the commission of those felonies with 'reckless indifference to human life' [citation] and, hence, the felony-murder special circumstances cannot stand. He fails to explain what practical difference this makes, since the jury also found true a multiple-murder special circumstance under section 190.2, subdivision (a)(3), to which subdivision (d) of the statute, by its very terms, does not apply." (*People v. Hoffman, supra*, F061127, at p. 36, fn. omitted.)

As for defendants' LWOP sentences, this court remanded the matter for the trial court to reconsider the sentences based on the factors in *Miller v. Alabama* (2012) 567 U.S. 460.

On May 24, 2013, the trial court reconsidered the sentences for both defendants pursuant to the factors articulated in *Miller*. After hearing testimony, the court again

imposed two consecutive LWOP terms for both defendants. Hoffman did not file an appeal from the court's resentencing order.[11]

## SENATE BILL NOS. 1437 & 775

The instant appeal is from the denial of appellant's petition for resentencing that he filed pursuant to Senate Bill No. 1437 (2017–2018 Reg. Sess. (Senate Bill 1437)).

Senate Bill 1437 was effective on January 1, 2019, and amended " 'the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).)[12]

"Substantively, Senate Bill 1437 accomplishes this by amending section 188, which defines malice, and section 189, which defines the degrees of murder, and as now amended, addresses felony murder liability." (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723; *People v. Gentile* (2020) 10 Cal.5th 830, 842.)

"In addition to substantively amending sections 188 and 189 of the Penal Code, Senate Bill 1437 added section 1170.95, which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*Lewis, supra*, 11 Cal.5th at p. 959.)

"Pursuant to section 1170.95, an offender must file a petition in the sentencing court averring that: '(1) A complaint, information, or indictment was filed against the

---

[11] On November 3, 2014, this court affirmed the sentences reimposed for Palafox. (*People v. Palafox* (2014) 231 Cal.App.4th 68, 73.)

[12] As amended, section 189, subdivision (f) states an exception that allows "individuals to be convicted of felony murder even if they did not act with malice and do not fall in one of the three categories of section 189, subdivision (e), where the victim is a peace officer engaged in the course of his or her duties and the defendant knows (or reasonably should know) these facts." (*People v. Hernandez* (2021) 60 Cal.App.5th 94, 99.)

15.

petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;] [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to section 188 or 189 made effective January 1, 2019.' [Citations.]  Additionally, the petition shall state '[w]hether the petitioner requests the appointment of counsel.'  [Citation.]  If a petition fails to comply with subdivision (b)(1), 'the court may deny the petition without prejudice to the filing of another petition.' " (*Lewis, supra*, 11 Cal.5th at pp. 959–960.)

"Where the petition complies with [section 1170.95,] subdivision (b)'s three requirements, then the court proceeds to subdivision (c) to assess whether the petitioner has made 'a prima facie showing' for relief.  [Citation.]  [¶]  If the trial court determines that a prima facie showing for relief has been made, the trial court issues an order to show cause, and then must hold a hearing 'to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not … previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.'  [Citation.] 'The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.'  [Citation.]  At the hearing stage, 'the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' " (*Lewis, supra*, 11 Cal.5th at p. 960.)

**Lewis**

In *Lewis*, the court interpreted the provisions of section 1170.95 and held that petitioners "are entitled to the appointment of counsel upon the filing of a facially sufficient petition [citation] and that only *after* the appointment of counsel and the opportunity for briefing may the superior court consider the record of conviction to

16.

determine whether 'the petitioner makes a prima facie showing that he or she is entitled to relief.' " (*Lewis, supra*, 11 Cal.5th at p. 957.)  " 'If the petitioner has requested counsel, the court *shall* appoint counsel to represent the petitioner.' "  (*Id*. at p. 963, italics added in original.)

*Lewis* also held that "at the prima facie stage, a petitioner's allegations should be accepted as true, and the court should not make credibility determinations or engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Lewis, supra,* 11 Cal.5th at p. 974.)  When the court conducts the prima facie determination, section 1170.95, subdivision (b)(2) only permits screening out "noncomplying petitions, not petitions that lack substantive merit." (*Lewis,* at p. 968.)

*Lewis* further held that after appointing counsel, the trial court may rely on the record of conviction to determine whether the prima facie showing has been made in order "to distinguish petitions with potential merit from those that are clearly meritless." (*Lewis, supra*, 11 Cal.5th at p. 971.)  "While the trial court may look at the record of conviction after the appointment of counsel to determine whether a petitioner has made a prima facie case for section 1170.95 relief, the prima facie inquiry under subdivision (c) is limited.  Like the analogous prima facie inquiry in habeas corpus proceedings, ' "the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved.  If so, the court must issue an order to show cause." ' " (*Lewis,* at p. 971.)

" 'However, if the record, *including the court's own documents*, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Lewis, supra*, 11 Cal.5th at p. 971, italics added.)

"Appellate opinions … are generally considered to be part of the record of conviction.  [Citation.]  However, as we cautioned in [*People v. Woodell* (1998) 17 Cal.4th 448, 457], the probative value of an appellate opinion is case specific, and 'it is

17.

certainly correct that an appellate opinion might not supply all answers.' [Citation.] In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' [Citation.] As the People emphasize, the 'prima facie bar was intentionally and correctly set very low.' " (*Lewis, supra*, 11 Cal.5th at p. 972.)

"[T]here is no categorical bar to consulting the record of conviction at the prima facie stage." (*Lewis, supra*, 11 Cal.5th at p. 972, fn. 6.) "In sum, the parties can, and should, use the record of conviction to aid the trial court in reliably assessing whether a petitioner has made a prima facie case for relief under [section 1170.95,] subdivision (c)." (*Id.* at p. 972, fn. omitted.)

The prima facie determination is a question of law, and the court may deny a petition at the prima facie stage if the petitioner is ineligible for resentencing as a matter of law. (*Lewis, supra*, 11 Cal.5th at p. 966.)

*Lewis* announced a prejudicial error standard under *People v. Watson* (1956) 46 Cal.2d 818, if the court failed to appoint counsel or violated the petitioner's statutory rights under section 1170.95, and the petitioner must "therefore 'demonstrate there is a reasonable probability that in the absence of the error he [or she] … would have obtained a more favorable result.' " (*Lewis, supra*, 11 Cal.5th at p. 974.)

Therefore, to demonstrate prejudice from the denial of a section 1170.95 petition before the issuance of an order to show cause, the petitioner must show it is reasonably probable that, absent error, his or her petition would not have been summarily denied without an evidentiary hearing. (*Lewis, supra*, 11 Cal.5th at pp. 972–974; see *People v. Watson, supra*, 46 Cal.2d at p. 836.)

**Senate Bill No. 775**

In October 2021, Senate Bill No. 775 was enacted and amended section 1170.95, effective on January 1, 2022. (2020–2021 Reg. Sess.; Stats. 2021, ch. 551, § 1 (Senate Bill 775).) As a result of the amendments, section 1170.95 clarified that a "person

convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter," may file a petition to have that conviction vacated under certain circumstances. (§ 1170.95, subd. (a).)

The amendments also codified the holding in *Lewis* that "[u]pon receiving a petition in which the information required by this subdivision is set forth …, if the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner." (§ 1170.95, subd. (b)(3).) After the petition is filed, the People shall file a response and the petitioner may serve a reply. (*Id*. at subd. (c).)

After the parties have the opportunity to submit briefs, "the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief." (§ 1170.95, subd. (c).) If the petitioner makes the prima facie showing, "the court shall issue an order to show cause." (*Ibid*.) If the court declines to issue an order to show cause, "it shall provide a statement fully setting forth its reasons for doing so." (*Ibid*.)

If an order to show cause is issued, "the court shall hold a hearing to determine" whether to vacate the petitioner's conviction, recall the sentence, and resentence petitioner. (§ 1170.95, subd. (d)(1).) At the hearing, the prosecution has the burden to prove beyond a reasonable doubt that petitioner is guilty of murder or attempted murder under the amended versions of sections 188 and 189. (*Id*. at subd. (d)(3).)

"At the hearing to determine whether the petitioner is entitled to relief … [t]he admission of evidence in the hearing shall be governed by the Evidence Code, except that the court *may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion*. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be

19.

excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens. A finding that there is substantial evidence to support a conviction for murder … is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3), as amended by Stats. 2021, ch. 551, § 2, eff. Jan. 1, 2022, italics added.)

## APPELLANT'S SECTION 1170.95 PETITION

On January 23, 2019, Hoffman filed a petition for resentencing pursuant to section 1170.95 and requested appointment of counsel.

The petition was supported by Hoffman's declaration, signed under penalty of perjury, where he checked boxes on a preprinted form that he was entitled to resentencing under section 1170.95 because a complaint or information was filed against him that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine; at trial, he was convicted of first or second degree pursuant to the felony-murder rule or the natural and probable consequences doctrine; and he could not now be convicted of first or second degree murder under the amended versions to sections 188 and 189 because he was not the actual killer; he did not, with the intent to kill, aid, abet, counsel, command, induce, solicit, request, or assist the actual killer in the commission of first degree murder; and he was not a major participant and did not act with reckless indifference.

On February 15, 2019, the court appointed counsel for Hoffman.

On July 21, 2020, Hoffman's counsel filed additional authorities in support of his petition, and argued he stated a prima facie case for relief because he was convicted under the felony-murder rule.

**The People's Opposition[13]**

On July 24, 2020, the People filed opposition to the petition, cited this court's opinion in the direct appeal (attached as an exhibit), and argued Hoffman failed to make a prima facie case because the jury found the special circumstances true, that he was the actual killer and a major participant who acted with intent to kill or reckless indifference to life.

**Hoffman's Reply**

On August 17, 2020, Hoffman filed a reply to the opposition, and again argued he made a prima facie case because he was convicted under the felony-murder rule.

**The Court's Denial of the Petition**

On August 18, 2020, the court held a hearing on Hoffman's petition; Hoffman waived his presence and was represented by his attorney. The court invited argument on whether Hoffman had shown a prima facie case for resentencing. Hoffman's attorney again argued he satisfied his burden because he was convicted under the felony-murder rule.

The prosecutor replied that section 1170.95 did not change a defendant's criminal culpability under the felony-murder special circumstance for being a major participant who acted with reckless indifference. The prosecutor also cited the jury's findings on the special circumstances, and the instructions given in CALCRIM Nos. 521 and 702, that the jury had to find a nonkiller acted with the intent to kill to find the special circumstance allegations true.

The court denied the petition, found Hoffman did not establish a prima facie case, and it did not issue an order to show cause, because the jury's finding on the multiple-murder special circumstance "could not have been found to be true in this case, unless

---

**13** On March 1, 2019, the People moved to dismiss the petition because Senate Bill 1437 was unconstitutional. On April 3, 2019, Hoffman filed opposition to the motion to dismiss. On June 11, 2020, the court denied the motion to dismiss.

21.

Mr. Hoffman either was an actual killer or acted as an aider and abettor with the specific intent to kill. Either of those findings, both of which were necessarily made by the jury in order for him to be found guilty of … the charges he was and for that special circumstance to be found true are fatal to a finding that he is entitled to relief."

On August 18, 2020, Hoffman filed a notice of appeal from the court's order.

## DISCUSSION

As noted above, appellant's counsel has filed a *Wende* brief with this court. The brief also includes the declaration of appellate counsel indicating that Hoffman was advised he could file his own brief with this court. By letter on June 21, 2021, we invited him to submit additional briefing. He did not do so.

### Section 1170.95

While Hoffman's petition was denied before *Lewis* was decided and section 1170.95 was amended by Senate Bill 775, the trial court complied with the amendments to section 1170.95, subdivisions (b) and (c) by appointing counsel, having the parties brief the issue at the prima facie stage, conducting a hearing on the petition, and stating reasons why it decided not to issue an order to show cause. (*Lewis, supra*, 11 Cal.5th at pp. 971–972; § 1170.95, subd. (c).)

In order to be eligible pursuant to section 1170.95, the petitioner must not have been the actual killer, acted with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life. (§§ 189, subd. (e), 1170.95, subd. (a)(3); see *People v. Gentile, supra*, 10 Cal.5th at p. 842.) The prima facie determination is a question of law, and the court may deny a petition at the prima facie stage if the petitioner is ineligible for resentencing as a matter of law. (*Lewis, supra,* 11 Cal.5th at p. 966.) While the appellate opinion on direct appeal is part of the record of conviction, the court cannot engage in premature factfinding based on the appellate opinion at the prima facie stage. (*Lewis, supra*, 11 Cal.5th at pp. 971–972; § 1170.95, subd. (d).) The court may rely on jury instructions, which are part of the

22.

record of conviction, to make the prima facie determination, because the instructions "given at a petitioner's trial may provide 'readily ascertainable facts from the record' that refute the petitioner's showing, and reliance on them to make the eligibility or entitlement determinations may not amount to 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*People v. Soto* (2020) 51 Cal.App.5th 1043, 1055, disapproved on another ground in *Lewis*, *supra*, 11 Cal.5th 952.)

In this case, the jury found true the multiple-murder special circumstance pursuant to section 190.2, subdivision (a)(3) as to each count, that requires the jury to find either that the defendant was the actual killer, or that he acted with intent to kill in aiding and abetting the murders. (*People v. Nunez and Satele* (2013) 57 Cal.4th 1, 45.) "When there is evidence from which a jury could base its convictions for multiple counts of murder on the theory that the defendant was guilty as an aider and abettor, and not as the actual perpetrator, the trial court must instruct the jury that to find true a multiple-murder special-circumstance allegation as to that defendant, it must find that the defendant intended to kill the murder victims." (*Ibid.*)

As set forth above, this court explained in the opinion on direct appeal that "[e]ven assuming [the jury] reached the premeditation theory and determined Hoffman was Palafox's accomplice rather than a direct perpetrator, jurors necessarily found Hoffman acted willfully with intent to kill: *They were instructed, pursuant to CALCRIM No. 521, that the defendant acted willfully if he intended to kill; and, pursuant to CALCRIM No. 702, that in order to find a multiple-murder special circumstance true as to a nonkiller, they had to find the defendant acted with the intent to kill. Because jurors found true the multiple-murder special circumstance, they necessarily determined Hoffman, assuming he was not the actual killer, had the specific intent to kill*. [Citation.] They also necessarily found he acted deliberately and with premeditation." (*People v. Hoffman, supra*, F061127, at pp. 34–35, italics added.) The jury was thus instructed that it had to

find Hoffman had the intent to kill both victims in order to find true the multiple-murder special circumstances.  (§ 190.2, subds. (a)(3), (c).)

After independent review of the record, we find that no reasonably arguable factual or legal issues exist.

## **DISPOSITION**

The judgment is affirmed.